Jorge F. ROMANY, et al., Plaintiffs, Appellees,

v.

COLEGIO DE ABOGADOS DE PUERTO RICO, Defendant, Appellant.

Oreste Ramos DIAZ, et al., Plaintiffs, Appellees,

v.

COLEGIO DE ABOGADOS DE PUERTO RICO, Defendant, Appellant.

Jorge SOUSS, et al., Plaintiffs, Appellees,

v.

COLEGIO DE ABOGADOS DE PUERTO RICO, Defendant, Appellant.

Robert E. SCHNEIDER, et al., Plaintiffs, Appellees,

v.

COLEGIO DE ABOGADOS DE PUERTO RICO, Defendant, Appellant.

Nos. 83–1586 to 83–1589.

United States Court of Appeals, First Circuit.

Argued Feb. 6, 1984.

Decided Aug. 23, 1984.

Laurence H. Tribe, Cambridge, Mass., with whom Kathleen Sullivan, Boston, Mass., and Susan Estrich, Cambridge, Mass., were on brief, for defendant, appellant.

Marvin S. Cohen, Washington, D.C., with whom John M. Gibbons, Stroock & Stroock & Lavan, Washington, D.C., Robert E. Schneider, Washington, D.C., and Hector L. Marquez, San Juan, P.R., were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and BREYER, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This appeal from the United States District Court for the District of Puerto Rico brings before us for the second—and perhaps not the last—time a dispute over compelled membership in Puerto Rico's integrated bar. *See In re the Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17 (1st Cir.1982). While we described many of the particulars in our earlier opinion, and while the facts were comprehensively stated by the district court, 565 F.Supp. beginning at 965, we restate them here with particular attention to events that have taken place in the Supreme Court of Puerto Rico as well as those in the federal court.

## I.

The Commonwealth of Puerto Rico has an integrated bar association known as the Colegio de Abogados de Puerto Rico ("Colegio"). While the Colegio's antecedents date back to the days of Spanish rule, the present Colegio was created in May of 1932 by Act No. 43, P.R.Laws Ann. tit. 4, § 771 *et seq.* The terms of that statute are not unlike statutes in force in 32 states of the union which likewise have integrated bars, *i.e.*, associations to which all lawyers are compelled to belong.[1]

The Colegio's express statutory duties are to "cooperate in the improvement of the administration of justice," "defend the rights and immunities of lawyers," promote fraternal relations, and "maintain healthy and strict professional morals among the members."[2] Membership in the Colegio is compulsory for all lawyers in Puerto Rico, and each member must pay the prescribed dues on pain of suspension from his right to practice.[3] Besides collecting dues, Puerto Rico law empowers the Colegio to issue forensic stamps which every Puerto Rico lawyer must affix to the initial document he files in any judicial proceeding, and to collect and use the proceeds from their sale. Puerto Rico law also authorizes the Colegio to issue and to receive proceeds

---

* Of the Fifth Circuit, sitting by designation.

1. *See Lathrop v. Donahue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (approving the Wisconsin unified bar). For one scholar's overview and his critique of the present status of such groups, *see* T. Schneyer, *The Incoherence of the Unified Bar Concept: Generalizing from the Wisconsin Case*, 1983 A.B.F.Res.J. 1.

2. The Colegio's statutory powers include adopting and establishing professional ethics, receiving and investigating complaints on the conduct of lawyers (a power also held by the Attorney General of Puerto Rico) and instituting disbarment proceedings before the Supreme Court of Puerto Rico. Also, the Colegio is to develop members' insurance programs, and create a non-profit bar foundation for handling legal aid.

3. The Supreme Court of Puerto Rico has held that it alone controls bar entry, and that legislation of this type regulating the right to practice law is advisory only. *Ex parte Jimenez*, 55 P.R.R. 51 (1939). However, the court has indicated its approval of Law No. 43 "as satisfactory legislation to aid this court in regulating admissions to the bar and the conduct of its members." *In re Bosch*, 65 P.R.R. 232, 235 (1945). Accordingly, the court has suspended lawyers, including two of the plaintiffs in this suit, from practice for nonpayment of Colegio's dues.

from the sale of notarial and other required stamps.

The dispute which underlies the present appeal is a claim by plaintiff attorneys that their associational rights under the first and fifth or fourteenth amendments of the United States Constitution are violated by being compelled to belong to the Colegio.[4] Particularly outrageous, in their view, is the Colegio's practice of taking public positions on controversial issues far removed from the immediate concerns of lawyers as a class—for example, on the desirability of supporting the Sandinista Front for National Liberation in Nicaragua, of forcing the United States Navy to leave the island of Vieques, and of stopping the draft. Plaintiffs assert a constitutional right not to associate with, or pay dues and fees to a group that publicly identifies with views with which plaintiffs disagree and which they perceive as immaterial to any legitimate professional interest which the integrated bar may be formed to promote.

### A. *Proceedings before the Supreme Court of Puerto Rico*

This dispute first surfaced in 1977 when the Colegio complained to the Supreme Court of Puerto Rico against 99 attorneys, including three of the five plaintiffs, for failure to pay prescribed membership dues to the Colegio. Most of the delinquents soon paid up, but two of those who later became plaintiffs below did not. These two attorneys, Robert F. Schneider, Jr., and Hector R. Ramos Diaz, raised affirmative defenses in the Supreme Court of Puerto Rico. Initially they pleaded both the Puerto Rico and United States Constitutions by way of defense, but subsequently they attempted to withhold and reserve their federal claims under purported analogy with *England v. Louisiana Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

On April 5, 1982, after argument and upon findings by a special master, the Supreme Court of Puerto Rico issued an opinion holding that the two lawyers had a duty to pay dues to the Colegio, and ordering them to do so. *Colegio v. Schneider,* 112 D.P.R. 540 (1982).

In upholding compulsory bar membership and compulsory financial support, the Supreme Court of Puerto Rico relied heavily upon federal constitutional precedents, including *Lathrop v. Donahue,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191, *see* note 1, *supra,* although it acknowledged that the litigants were pressing only claims under the Constitution and laws of Puerto Rico. The court also relied upon a distinctive tradition of compulsory bar associations in civil law jurisdictions and upon the socio-political circumstances of Puerto Rico.

Bar associations in civil law jurisdictions, it explained, have "from time immemorial" enjoyed both compulsory membership and a "primarily political role." In Spain and France their political involvement led, from time to time, to the termination of their privileges—including of compulsory membership—by "absolutist" regimes opposed to the "liberties they professed." *Colegio v. Schneider,* 112 D.P.R. 540, 550–51 (1982) (official translation). In Puerto Rico, the court stated, the bar association had enjoyed compulsory membership, from its establishment by Royal Decree in 1840,

> until it was suppressed by General John R. Brooke during the United States military government on the Island. U.S. Department of War, *General Orders and Circulars,* 1898–1900, G.O. 20 of December 3, 1898. Instead of the Bar Association of Puerto Rico, it established a colorless entity, which was voluntary and which led a precarious life until the present Bar Association was created by Act No. 43 of May 14, 1932.

---

**4.** *See Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 599–601, 96 S.Ct. 2264, 2279–80, 49 L.Ed.2d 65 (1976) (leaving open the question whether due process guarantees against actions of the government of Puerto Rico emanate from the fifth or fourteenth amendments).

*Id.* at 544–45. That legislation, the court noted, revived one of Puerto Rico's "most ancient and respected institutions." *Id.* at 547.

"The singular socio-political circumstances of Puerto Rico" also buttress the constitutionality of Law No. 43. *Id.* at 549.

Institutions such as the Bar Association—the Legislature has extended the compulsory membership to many other groups—fulfill a very special mission in our society. Contrary to the strongly pluralistic character of North American society, our milieu has traditionally been monolithic, lacking the many independent voices that make such great contributions to the health of the democratic way of life.

*Id.* at 547. The establishment of a strong bar association, then, with compulsory membership, serves the "public interest in the creation of a strongly pluralistic society, in furtherance of the practice of law and [in] the good operation of the judicial system . . . ." *Id.* at 549. The bar association exists not merely "for the strict interest of a class [*i.e.*, lawyers], but also for the good operation of justice in our country and the social advancement of the community." *Id.* at 547. These interests "outweigh[ ] the personal inconveniences that compulsory membership might entail." *Id.* at 549. Hence, even though Colegio enjoys compulsory membership, the court held, it has "ample freedom of speech under the provisions of art. II, Sec. 4 of the Constitution [of Puerto Rico]" and "need not be a quiet and blushing entity, afraid to use the voice granted it by the very pluralistic purpose it should serve . . . ." *Id.* at 551.

The court explained, however, that the Constitution of Puerto Rico also protects the Colegio's dissenting members as "the sense of the freedom of speech clause contained in Art. II, Sec. 4 of the Constitution of Puerto Rico is not narrower than that

given by the United States Supreme Court to the First Amendment" in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Accordingly, while the Colegio is entitled to speak out boldly on ideological matters,

[L]awyers who dissent from such pronouncements—and not those who object to the Bar Association's performance of its statutory purposes or of those imposed by this Court—enjoy, under the Constitution of Puerto Rico, the right to raise objections to the use of their contributions or of part thereof for ideological activities they do disapprove. Such disapproval may be of a general nature, as it was expressed in *[Railway Clerks] v. Allen*, 373 U.S. 113 [83 S.Ct. 1158, 10 L.Ed.2d 235] [(1963)] and in *Abood.*

112 D.P.R. at 554–55.

In the fifth and final part of its opinion, headed "The Remedy," the Supreme Court of Puerto Rico instructed the Colegio, not later than the date set for collecting its next annual dues, to devise a method for ascertaining that contributions[5] of a dissenting member shall not be used for ideological purposes. The court said the method "shall duly follow the principles laid down in *[Machinists v.] Street*, [367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961),] *Allen* and *Abood.*" Other directions were included.

A month after issuing the above opinion, the Supreme Court of Puerto Rico issued a resolution dated May 6, 1982, retaining jurisdiction,

to take cognizance of any issue regarding the fifth and last part of our judgment of April 5, 1982, and also to approve, disapprove or finally modify the remedy that shall be drawn.

The above resolution was followed, a month later, by the Puerto Rico court's further resolution suspending the two

5. There is a dispute between the parties on appeal whether the Supreme Court's order intended that the Colegio devise a method to prevent bar stamp fees, as well as dues, emanating from a dissenter, from being used "for ideological purposes." The Colegio insists that the Supreme

Court meant to cover stamp fees also. The district court and the plaintiffs think otherwise. We assumed the correctness of the latter position in *In re the Justices of the Supreme Court of Puerto Rico*, 695 F.2d at 26.

plaintiffs from practice. The court found they had disregarded directions in its opinion of April 5, 1982, to pay their Colegio dues within 15 days, "while the remedy mentioned in the opinion is being implemented."

### B. *The Federal Suit*

Soon thereafter, on June 9, 1982, the two suspended attorneys brought the present action in the federal district court. Relying now on the federal Constitution, they challenged the requirement that lawyers belong and pay dues and stamp fees to the Colegio.[6] The three other plaintiffs brought similar separate actions a short time later.

### C. *The Colegio's Plan for Dissenter Refunds*

At about the same time the federal proceedings were getting underway, the Colegio announced certain steps that it was taking under the Puerto Rico Supreme Court's directive to devise a plan for avoiding use of dissenters' payments for ideological activities. On June 25, 1982, the president of the Colegio filed the first of two informative motions in the Supreme Court of Puerto Rico explaining the Colegio's views on what constituted "ideological purposes." This document suggests that, in the Colegio's view, only partisan political statements will qualify as "ideological" for purposes of the court's opinion. The document also seems to define all of the Colegio's past and intended pronouncements as falling outside of that definition.

In December 1982 the Colegio filed another informative motion, this one notifying the Supreme Court of Puerto Rico that it had adopted regulations creating a seven-member board to be known as "The Review Board of the Activities of the Colegio de Abogados of Puerto Rico."[7] The Board's function was said to be to classify the Colegio's activities "on the basis of the definition of ideological activities contained in the Informative Motion of June 25, 1982." See above. Lawyers who "at the time of payment of annual dues have affirmatively expressed their objection to the use of their money for ideological purposes," as defined, may file a complaint within 30 days after an action they object to. The board may summarily dismiss the complaint if deemed insufficient, or it may schedule a public hearing. After a full public hearing (and possible appeal to the Supreme Court of Puerto Rico) the board may grant the objector a proportionate refund from his contribution. It may also grant similar refunds to other lawyers who (1) have earlier indicated objection to having their dues used for ideological ends,

---

**6.** Robert F. Schneider, Jr., and Hector R. Ramos Diaz, the two attorneys who were suspended in the proceeding before the Supreme Court of Puerto Rico, not only sought injunctive and declaratory relief against the Colegio, the Commonwealth Secretaries of the Treasury and of Justice, and the Justices of the Supreme Court, based on the alleged unconstitutionality of the statutes compelling bar membership and payment of dues and stamp fees, but also sought damages. They charged that the disciplinary proceeding leading to their suspensions was unconstitutional and grew out of a conspiracy between the Colegio and the Justices.

The district court dismissed Schneider's and Hector Ramos's damages claims against the Justices and, for the most part, against Colegio on immunity grounds, and their claims challenging the outcome of the prior disciplinary proceedings as barred by *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Other claims against the Justices, with minor exception, were also dismissed. The district

court, however, rejected the defendants' argument that the doctrines of collateral estoppel and res judicata foreclosed Schneider's and Ramos's claims for prospective relief from the operation of Law No. 43 and allied statutes. The district court examined the preclusive effect that would be afforded the disciplinary proceeding by a Puerto Rico court, finding that further litigation was permissible. *See Migra v. Warren City School District Board of Education,* — U.S. —, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The parties have not challenged these rulings, which are reported at 546 F.Supp. 1251 (D.P.R.1982).

**7.** The first Board was elected in the fall of 1982 after balloting upon a slate of seven names submitted to the membership by the Colegio's Board of Governors. Write-ins were, however, allowed.

and (2) within 30 days have requested in writing the specific refund.

Since being advised of the Colegio's plan through the medium of these motions, the Supreme Court of Puerto Rico has not approved or disapproved it. However, on June 30, 1983—two weeks after the district court decided the present case—it issued a resolution, stating "the remedy adopted by the Bar Association following our April 1982 opinion, is still before our consideration pending approval, modification, or rejection." Then, on October 20, 1983, the court issued another resolution inviting Schneider and Hector Ramos to comment on the Colegio's remedy and to propose any modifications or alternate measures. At the same time the court invited the Colegio to comment in light of its experience with the Review Board and the regulations.

The present appeal (*i.e.*, from the judgment of the district court) was argued before us in February 1984.

### D. *The District Court's Decision*

We now describe the district court's opinion and injunction which came down on June 16, 1983, following an evidentiary hearing and full argument and briefing. *Schneider v. Colegio de Abogados de Puerto Rico*, 565 F.Supp. 963 (D.P.R.1983).

The district court held that, without question, "the Colegio engages in ideological and/or political activism of a pervasive and continuous nature, totally unrelated to the stated legislative purposes for which it was created." In support of this finding, the court listed matters on which the Colegio had taken positions, many of which are highly controversial and are beyond the specialized concerns of lawyers. While plaintiffs and presumably others differed from the Colegio's position, the court found that in annual appearances before the United Nations Decolonization Committee the Colegio's president has represented as the view of *"all* the members of the Colegio" that Puerto Rico is a colony of the United States. *Id.* at 966. Such ideological expressions, the district court felt, were "hardly discouraged by the Supreme Court

of Puerto Rico's decision in *Colegio de Abogados de Puerto Rico v. Schneider* . . . ." The district court ended this portion of its opinion with the observation "if one thing is clear in this case, it is the proliferation of the Colegio's ideological and/or political activities."

The district court went on to hold that the Colegio was a state actor for purposes of section 1983—a point not now in dispute.

And finally the district court held that the Colegio's use of mandatory fees for political and ideological purposes was unconstitutional, and that the remedy structured by the Colegio pursuant to the Supreme Court of Puerto Rico's order, was a "sham." *Id.* at 977. In the district court's view, it was doubtful whether the Supreme Court of the United States would regard a refund remedy, such as the one approved in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), as appropriate on the present facts. The district court thought the instant situation was "light years apart" from the labor union situation in *Abood*. But even if *Abood* controlled, the district court found the Colegio's review board regulation to fall "considerably short of the mark." It was "illustrative of the cynicism and bad faith with which the Colegio has been handling the entire subject matter of the present suits." The court made this statement after analyzing the elaborate procedure established by the Colegio, which it described as merely an opportunity for the dissident "to engage the Colegio in bureaucratic shadow-boxing."

The district court concluded that Puerto Rico's integrated bar was *on its face* constitutional, citing *Lathrop v. Donahue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 but that the "cold letter of these statutes" does not reflect "the true facts of life."

"As shown, the long-standing, pernicious and massive ideological and political practices, which have until recently been tolerated *sub silentio* and which are presently encouraged by the very state agencies charged with control and regulation of the integrated bar, present a

very different picture as to how Law 43 and the related statutes are actually administered. These practices, we have held, are clearly unconstitutional. Such flagrant violations of the civil rights of Plaintiffs cannot be allowed to continue if *their* constitutional rights have any worth other than one of purely academic value.... They affect Plaintiffs' means of earning their livelihood in their chosen profession, and require that the court in the protection of their rights, and because of the magnitude of these violations, exercise its equitable powers to the fullest extent to prevent further violations by Defendants."

565 F.Supp. at 978.

The district court ruled that "until such time as the Colegio ceases to engage in ideological and/or political activism," all defendants except the Justices of the Supreme Court of Puerto Rico are enjoined from taking any action of any type against Colegio members for nonpayment of any due or fee. They were further enjoined from denying anyone the right to practice law or engage in notarial practice by reason of their failure to pay any due or fee to the Colegio. They were also enjoined from selling forensic or notarial stamps on behalf of the Colegio or "from forwarding to the Colegio the proceeds of any public funds collected on behalf of or for the Colegio, including but not limited to the sale of forensic or notarial stamps." Finally, these defendants were enjoined from denying full legal validity to any pleading, public instrument or deed because they do not contain forensic or notarial stamps.

The court also issued a declaratory judgment, declaring unconstitutional "as interpreted, enforced, and applied" various portions of Law No. 43 and other statutes providing for the Colegio to receive the proceeds from the sale of bar stamps. Nominal damages of $1 each were also awarded to three of the plaintiffs against the Colegio.

The district court refused to stay its judgment, *Schneider v. Colegio de Abogados de Puerto Rico*, 572 F.Supp. 957 (D.P.R.1983), and the Colegio appealed. This court has since stayed the district court's judgment pending appeal.

## II.

On appeal, the Colegio argues that the district court's sweeping injunction, bringing all Colegio funding and activities to a halt until the Colegio withdraws from ideological and partisan activism, protects dissenters' first amendment associational rights "not with a scalpel but with a bludgeon." [8] The Colegio additionally argues that the district court erred "by reaching the merits while the Supreme Court of Puerto Rico undertakes, in pending proceedings, to fashion a remedy for the very grievances that underlie the federal complaint."

Appellees respond that only a remedy such as the district court provided could suffice to protect plaintiffs, since "no remedial system addresses coerced association," and since the Colegio's proposed remedy was totally ineffective. Against appellant's abstention argument, appellees posit that the Supreme Court of Puerto Rico has fully announced its position, and has indicated no serious intention to redress the Colegio's "sham" remedy. Appellees contend this case does not fit within the guidelines for abstention.

As we shall discuss below, we agree with appellant that the district court should have abstained while retaining jurisdiction, thus allowing the Supreme Court of Puerto Rico a reasonable time within which to review the Colegio's remedy, and to accept, reject or modify it. We therefore vacate the injunction without ruling on the merits of the district court's analysis, and direct that the district court await action by the Puerto Rico court before proceeding to the merits of the matters before it. We do not say the district court must await indefinitely, but we think the Supreme Court of

---

**8.** Neither the Justices of the Supreme Court of Puerto Rico, who remained nominal parties be- low, nor the Commonwealth Secretaries of the Treasury and of Justice took appeals.

Puerto Rico must be allowed an opportunity to complete the process initiated but not completed in its opinion of April 5, 1982.

A recent Supreme Court decision makes it plain, however, that appellees cannot constitutionally be forced to pay full dues to the Colegio during the interim period before this litigation is finally resolved. *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* — U.S. —, 104 S.Ct. 1883, 1889–90, 80 L.Ed.2d 428 (1984). We accordingly make provision for certain relief during the interim.

### III. ABSTENTION

 We ·hold that the district court should have stayed its hand in this case, pending final determination of the issues turning upon Puerto Rico law, as it is clear that completion of the remedial stage of *Colegio v. Schneider* "might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially alter the nature of the problem." *Harrison v. NAACP,* 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959) (emphasis supplied); *Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). Abstention is appropriate "where, as in this case, the uncertain status of local law stems from the unsettled relationship between the state constitution and a statute." *Harris County Commissioners Court v. Moore,* 420 U.S. 77, 85; 95 S.Ct. 870, 876, 43 L.Ed.2d 32 (1975); *Meridian v. Southern Bell Telephone & Telegraph Co.,* 358 U.S. 639, 641, 79 S.Ct. 455, 457, 3 L.Ed.2d 562 (1959) (per curiam).

The Supreme Court of Puerto Rico, in its April 5, 1982 opinion, while upholding the constitutionality of Puerto Rico's integrated bar, held that under the Constitution of Puerto Rico dissenting members of the bar were entitled to a pro rata refund of dues to the extent the Colegio engaged in ideological actions not related to the Colegio's statutory purposes. In so doing, the court adopted as a matter of Puerto Rico law a remedy devised for dissenting workers by the Supreme Court of the United States in closed shop labor cases. *Machinists v.*

*Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Railway Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963); *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). It ordered the Colegio to develop a plan to implement this concept. While citing to cases from the Supreme Court of the United States, the Puerto Rico court reflected its own authoritative interpretation of the Constitution of Puerto Rico, which, it determined, recognizes associational and free speech rights no less than those in ·the federal Constitution. In ordering this remedy, the Supreme Court of Puerto Rico acted not only under its power to construe Puerto Rico's constitution but under its inherent judicial power to determine the grounds for admission to the bar. *See* note 3, *supra.* The latter power exceeds that of the Puerto Rico legislature in this special area, thus the court has unique latitude to fashion a direct solution without returning to the legislature.

The Supreme Court of Puerto Rico has yet to complete its remedial action. While the Colegio adopted a regulation in purported conformity with the court's opinion, the court has indicated that it will review that regulation. Although serious objections can be raised to the Colegio's proposed remedy, the Puerto Rico court has plenary power to reject and revise the Colegio's action if it is so inclined for reasons of law· or policy. It could conceivably do so in such a way that plaintiffs will obtain all the relief to which they are entitled under federal constitutional standards.

To be sure, even if the Puerto Rico court were to insist upon a workable *Abood*-style remedy, and even if it were to rethink its position on refunds in light of the recent case of *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* — U.S. at —, 104 S.Ct. at 1889–90 (which rejected the adequacy of "the pure rebate approach"), plaintiffs could argue that the Colegio's penchant for ideological contention is so pervasive and unremitting—as compared with, say, the Wisconsin Bar as

characterized in *Lathrop*[9]—that Puerto Rico cannot constitutionally force dissenters to join. Alternatively, plaintiffs might contend that a more sweeping remedy than the *Abood* remedy is necessary here—for example, enforced separation of the ideological component of the Colegio from its "core" functions, with dissenters being compelled to join only the latter component.[10] The district court in its opinion indicated that it saw the present situation as factually distinguishable. (It did not, however, expressly attempt to distinguish *Lathrop*.)

Nonetheless, while even provision of a remedy in complete compliance with *Abood*

and its progeny would not necessarily signal the end of plaintiffs' federal case, it would surely transform it. As the Colegio points out, existing law to date upholds the concept of integrated bars, and the only dissenters' remedy yet addressed by the United States Supreme Court (although in a different context) is the reduction in dues discussed in *Abood,* and, most recently, in *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* — U.S. at ——, 104 S.Ct. at 1889–90.[11] If such a remedy were truly afforded, the Colegio could argue (although we think it premature for us to indicate whether or not we would accept

9. Although we do not decide the issue here, it can be argued that *Railway Employee's Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), followed in *Lathrop,* and *Hanson*'s progeny—*Street, Allen, Abood,* and now *Ellis, see* note 10—are viable precedent in the bar association context only when certain factual predicates, existing in *Lathrop,* are met. In *Lathrop* the plurality expressly rejected plaintiff's characterization of the Wisconsin bar association as "partak[ing] of the character of a political party." 367 U.S. at 833, 81 S.Ct. at 1832. Any suggestion that it was "a sham organization deliberately designed to further a program of political action" was barred by the procedures adopted by the association to assure "substantial unanimity" among members and to recognize views of dissenters. *Id.* at 834, 81 S.Ct. at 1833. (Indeed, one commentator has suggested that the willingness of the plurality to uphold the constitutionality of the Wisconsin scheme depended upon these procedural safeguards. *See* T. Schneyer, *The Incoherence of the Unified Bar Concept: Generalizing from the Wisconsin Case,* 1983 A.B.F.Res.J. 1, 55–56.) These procedures, moreover, focused bar political debate on matters "of general professional interest." *Lathrop,* 367 U.S. at 834 n. 9, 81 S.Ct. at 1833 n. 9. The *Lathrop* plurality also noted there that "legislative activity [was] not the major activity of the State Bar," *id.* at 839, 81 S.Ct. at 1835, and that "the bulk of the State Bar activities serve the function ... of elevating the educational and ethical standards of the Bar to the end of improving the quality of legal service available to the people of the state without reference to the political process." This was a "legitimate end of state policy" permitting compulsory dues even though the association "engaged in some legislative activity." *Id.* at 843, 81 S.Ct. at 1838. *See also In re Amendment to Integration Rule of the Florida Bar,* 439 So.2d 213 (Fla.Dist. Ct.App.1983), and *Report of Committee to Review the State Bar,* 334 N.W.2d 544 (Wis.Ct.App.

1983) (focusing on similar procedural safeguards).

In the instant case, while the district court canvassed the range of the Colegio's ideological activities, it did not describe the Colegio's other pursuits or the proportion of resources devoted to them. We assume at this stage of the litigation that the Colegio, like the bar association examined in *Lathrop,* has a "multifaceted character, in fact as well as in conception." *Id.* at 842, 81 S.Ct. at 1837.

10. To our knowledge, however, no court has held that compulsory bar dues may never be used to further *any* political, or perhaps more accurately, "legislative" purposes. *See, e.g., Arrow v. Dow,* 544 F.Supp. 458, 463 (D.N.M.1982) (striking compulsory support for certain lobbying while "declin[ing] to hold categorically that the Bar is prohibited from spending bar dues for lobbying"); *Report of Committee to Review the State Bar,* 334 N.W.2d 544 (Wis.1983) (accepting committee recommendation to impose rebate system, without deciding whether such system was constitutionally mandated); *see also Falk v. State Bar of Michigan,* 418 Mich. 270, 342 N.W.2d 504 (1983), 411 Mich. 63, 305 N.W.2d 201 (Mich.1981) (failing to reach consensus on issue). In *Lathrop* Justices Harlan and Frankfurter approved the use of such dues to support "legislative activities" where the supervising state court had restricted these activities to "the more technical areas of the law into which no well-advised layman would venture without the assistance of counsel," 367 U.S. at 861, 864, 81 S.Ct. at 1849; their position, however, did not command a majority of the Court.

11. *Ellis* held that a "pure rebate approach is inadequate" under section 2, Eleventh of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, given "acceptable alternatives" "such as advance reduction of dues and/or interest bearing escrow accounts ...." —— U.S. at ——, 104 S.Ct. at 1889–90.

the argument, and do not do so here) that the federal Constitution was satisfied.

Conversely, of course, to the extent whatever remedy the Supreme Court of Puerto Rico approves falls short even of the standards established in *Abood* and *Ellis*, plaintiffs will have a different, more specific and more powerful federal constitutional claim.

Our point is simply that until the Supreme Court of Puerto Rico acts, or at least shows that no further action can be expected, the dimension of the constitutional issue for federal adjudication will remain unsettled. For that reason alone, there is good reason for the federal court to stay its hand while retaining jurisdiction. *Harrison v. NAACP*, 360 U.S. at 177, 79 S.Ct. at 1030.

■ The argument for abstention is also greatly strengthened by several special factors. First, as noted, a state proceeding is already in being.

> Where there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, [the Supreme Court has] regularly ordered abstention. See *Askew v. Hargrave*, [401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971)]; *Albertson v. Millard*, 345 U.S. 242 [73 S.Ct. 600, 97 L.Ed. 983] (1953); *Chicago v. Fieldcrest Dairies, Inc.*, 316 U.S. 168, 173 [62 S.Ct. 986, 988, 86 L.Ed. 1355] (1942); cf. *Meredith v. Winter Haven*, 320 U.S. 228, 236 [64 S.Ct. 7, 11, 88 L.Ed. 9] (1943).

*Harris County Commissioners Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 874, 43 L.Ed.2d 32 (1975). Indeed, in the cases cited the state court proceeding typically started *after* the federal action and in one case at least, was initiated by parties unrelated to the claimant in the federal case. *Askew v. Hargrave*, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). Of course, serious delays in the litigation may argue against abstention. *See Harris County Commissioners Court*, 420 U.S. at 84, 95 S.Ct. at 875. But here the Colegio argues that delays in the Commonwealth proceeding were tied to the progress of this action.

We note, moreover, that plaintiffs have apparently refused to provide to the Puerto Rico tribunal meaningful comment on the Colegio's proposed remedy based upon the Commonwealth's Constitution. When asked for their recommendations on that matter, Schneider and Hector Ramos answered, "without accepting nor submitting to the jurisdiction of the Honorable Supreme Court," that since the court had rejected their arguments in adopting its opinion, "there is no reason nor justification in law to require that [they] once again formulate their commentaries and objections" as to the Colegio's proposal.

A second special factor supporting abstention is the unique role of the Supreme Court of Puerto Rico in a proceeding of this nature, a role which makes it especially desirable for the federal courts to allow it to act before they consider stepping in.

> [W]hen the state-law questions have concerned matters peculiarly within the province of local courts, see *Reitz v. Bozanich*, [397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970)]; *Fornaris v. Ridge Tool Co.*, 400 U.S. 41 [91 S.Ct. 156, 27 L.Ed.2d 174] (1970); cf. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 [79 S.Ct. 1070, 3 L.Ed.2d 1058] (1959), [the Supreme Court has] inclined towards abstention.

*Harris County Commissioners Court*, 420 U.S. at 84, 95 S.Ct. at 875. As already mentioned, the Supreme Court of Puerto Rico not only may exercise its usual judicial powers but, because of its inherent power over the bar, can also act outside the relevant statutes. Thus it is not limited, as a federal court is, merely to striking down unconstitutional statutory provisions. Rather, it can directly fashion relief, so as to rectify an otherwise unconstitutional provision relating to bar membership. Were the Supreme Court of Puerto Rico persuaded that the dissenters' remedy it previously suggested was no longer sufficient in light of *Ellis* or other considerations, it could take a different tack, even going so far as to order the Colegio to leave the taking of public positions on mat-

ters unrelated to the Colegio's core statutory purposes to a separate group having a purely voluntary membership.[12] In any case, because of its inherent powers, the Supreme Court of Puerto Rico could establish this or some other remedy without any need for legislative change, and is therefore uniquely situated to structure a workable remedy.

■ Finally, the expertise, cooperation and goodwill of the Supreme Court of Puerto Rico will make much difference to the success of any remedy from whatever source over the long run. This fact alone suggests the need for restraint in these circumstances. Abstention is, after all, a

> well-established procedure ... aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system. To minimize interference a "scrupulous regard for the rightful independence of state governments ... should at all times actuate the federal courts," *Matthews v. Rodgers,* 284 U.S. 521, 525 [52 S.Ct. 217, 219, 76 L.Ed. 447], as their "contribution ... in furthering the harmonious relation between state and federal authority ...." *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971.

*Harrison v. NAACP,* 360 U.S. at 176, 79 S.Ct. 1030. Here we are concerned with the proper relationship between the federal and Commonwealth courts, "functioning as a harmonious whole." *Chicago v. Fieldcrest Dairies, Inc.,* 316 U.S. 168, 173, 62 S.Ct. 986, 988, 86 L.Ed. 1355 (1942). Given the fact that the Supreme Court of Puerto Rico has demonstrated its awareness of the constitutional problem, we think the federal courts should be slow to come between it and the remedial steps it is contemplating. Thus while we can appreciate the concerns of the district court, we think this matter must be approached with deliberation and full respect for the role of the judiciary of the Commonwealth of Puerto Rico.

## IV.

In the previous section we did not distinguish between the separate issues of the Colegio's dues and of its forensic and notarial stamps, although arguably these issues require different legal analyses and come to us in distinct postures for abstention.

The Colegio argues vigorously that the Supreme Court of Puerto Rico "explicitly dealt with the stamp challenges on the merits" in its April 5, 1982 opinion and has "specifically" included "these items" in its guidelines for a remedy for dissenting members. It asserts, therefore, that the stamp issue, like the dues issue, is a matter of live controversy before the Commonwealth's highest court and thus appropriate for abstention. While we were not convinced that this was a proper characterization of the Puerto Rico court's opinion in *Colegio v. Schneider* at the time of our prior decision, *see* note 5, *supra,* we were not asked to, and did not consider, the propriety of *Pullman* abstention at that time, perhaps because the Justices of the Supreme Court of Puerto Rico were then before us as active litigants. Now, however, the Justices' posture in the case has changed to that of nominal parties; they have not participated in this appeal in any manner. We, therefore, think it appropriate that the Justices be given an opportunity, as a court, to clarify their position on the stamp issue.

Whether or not the stamp statutes have been addressed by the Commonwealth court, we consider these provisions to present precisely the sort of "unsettled question of state law" which abstention was designed to resolve. *Harris County Commissioners Court,* 420 U.S. at 83, 95 S.Ct. at 875; *Santasucci v. Gallen,* 607 F.2d 527 (1st Cir.1979). While it appears

---

12. One commentator has suggested that a "better solution" than *Abood's* rebate scheme "might well be to require ideological activities unrelated to collective bargaining to be financed from voluntary contributions in the first place." L. Tribe, *American Constitutional Law* § 12–4, at 589 n. 5 (1978).

likely that some remedy may be forthcoming for dissenters concerning the stamps, it is not certain whether the Supreme Court of Puerto Rico will reduce their cost for dissenters, bar the use of stamp sale proceeds altogether for ideological pursuits, or take some other position which will tend to moot or at least reshape the federal constitutional question.

If the Colegio's view of the Puerto Rico court's opinion and order is correct, however, we are confronted by the stark fact that the Colegio's proposed remedy is completely silent on the matter of forensic and notarial stamps, affording no relief for dissenters whatever. That silence was construed by the district court as evincing bad faith. Given the Colegio's present representations to us that dissenters are entitled to relief as a matter of Puerto Rico law and that the Supreme Court of Puerto Rico so held, we would expect the Colegio to maintain that position in the future, and to offer an appropriate remedy proposal to the Puerto Rico court.

## V.

 While we consider this an appropriate case for abstention, this is not to say that the federal court is powerless, that plaintiffs' rights under the federal Constitution are to be forgotten, or that the district court should stay its hand forever. Abstention "does not ... involve the abdication of federal jurisdiction, but only the postponement of its exercise." *Harrison v. NAACP*, 360 U.S. at 177, 79 S.Ct. at 1030. The district court may proceed after the Supreme Court of Puerto Rico has finally determined what remedy to provide, or sooner in the unlikely event of some unusual delay. *Louisiana Power & Light Co. v. Thibodaux*, 360 U.S. 25, 31, 79 S.Ct. 1070, 1074, 3 L.Ed.2d 1058 (1959).

One aspect of plaintiffs' situation, however, calls for redress during the pendency of further proceedings. Under the Puerto Rico Supreme Court's current order, attorneys must pay the full Colegio dues in order to retain good standing at the Puerto Rico bar. Relief is limited to an eventual refund. But while a rebate of this nature found some support in earlier Supreme Court cases, *see Ellis,* —— U.S. at ——, 104 S.Ct. at 1889–90, its adequacy has recently been rejected by the Court.

[W]e hold that the pure rebate approach is inadequate.

By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are outside the scope of the statutory authorization ....

The only justification for this union borrowing would be administrative convenience. But there are readily available alternatives, such as advance reduction of dues and/or interest bearing escrow accounts, that place only the slightest additional burden, if any, on the union. Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily ....

*Id.* Given this clear statement by the Court, we think plaintiffs should not be required to wait before being afforded any reduction in their annual dues. As earlier indicated, we do not decide now whether dues-reduction *alone* is a satisfactory answer to plaintiffs' complaint; but at least it is clear that, *at a minimum*, dissenting attorneys may not be forced to subsidize ideological activity outside the ambit of activities for which membership may properly be compelled. This being so, plaintiffs should not be forced to pay full dues to the Colegio while this litigation proceeds.

 A reasonable interim solution, fair to both sides, would be for plaintiffs who wish to practice to have to pay only 50 percent of their annual dues directly to the Colegio *pendente lite,* with the remaining 50 percent to be paid into an interest-bearing escrow account managed by a bank or other completely neutral entity. The escrow agreement should provide that these sums and the accumulated interest will eventually go to the Colegio and plaintiffs, in such amounts and proportions as the court directs pursuant to a final resolution

of this litigation (meaning resolution at both the Commonwealth and federal levels). If the Supreme Court of Puerto Rico is willing to order and supervise such an immediate remedy (which would, of course, be only temporary, until the claims now in dispute are finally resolved both in the Supreme Court of Puerto Rico and, if necessary, the federal courts) we would encourage it to do so. If the Supreme Court of Puerto Rico does not itself order such an interim remedy within 60 days after issuance of our mandate, we direct the district court to do so.[13]

*The judgment of the district court is vacated and the case remanded for proceedings not inconsistent herewith.*

---

**13.** To order interim temporary relief of this character is consistent with abstention, since during abstention a federal court may "protect the appellees while this case goes forward." *Harrison v. NAACP,* 360 U.S. at 179, 79 S.Ct. at 1031. *See also Babbitt v. United Farm Workers,* 442 U.S. 289, 312 n. 18, 99 S.Ct. 2301, 2316 n. 18, 60 L.Ed.2d 895 (1979); *Silverman v. Browning,* 359 F.Supp. 173 (D.Conn.1972), *aff'd mem.,* 411 U.S. 941, 93 S.Ct. 1927, 36 L.Ed.2d 406 (1973). This court has previously authorized "preliminary injunctive relief during the period that the district court, retaining jurisdiction, awaits the state outcome" where "considerations of equity and fairness required." *Catrone v. Massachusetts State Racing Commission,* 535 F.2d 669, 672 (1st Cir.1976). *See Hotel and Restaurant Employees and Bartenders International Union v. Danziger,* 709 F.2d 815, 832 (3d Cir.1983); *New Jersey-Philadelphia Presbytery v. New Jersey State Board of Higher Education,* 654 F.2d 868, 885–86 (3d Cir.1981); *Coley v. Clinton,* 635 F.2d 1364, 1379–80 (8th Cir.1980). *See also* C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4243, at 473 (1978).