**SOUTH BOSTON ALLIED WAR VETERANS COUNCIL, et al., Plaintiffs,**

v.

**The CITY OF BOSTON, et al., Defendants.**

Civ. A. No. 94–11402–MLW.

United States District Court, D. Massachusetts.

Jan. 17, 1995.

---

**894**

Chester Darling, Boston, MA, for plaintiffs.

John J. Hurley, pro se, and for the members of the association.

Susan M. Weise, City of Boston Law Dept., Claudia B. McKelway, Davis, Malm & D'Agostine, P.C., Boston, MA, for defendants.

Philip M. Cronin, Elsie B. Kappler, Peabody & Arnold, John Ward, Zalkind, Rodriquez, Lunt & Duncan, Mary L. Bonauto, Boston, MA, for G.L.I.B.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. SUMMARY

In July 1994, the South Boston Allied War Veterans Council (the "Veterans"), which has traditionally sponsored the annual St. Patrick's Day Parade in Boston (the "Parade"), instituted this action against the City of Boston (the "City") and its Mayor. The Veterans request a declaratory judgment and injunction to compel the City to issue the Veterans a permit for a Parade to be held on March 19, 1995, without the special condition that the Veterans allow the Irish–American Gay, Lesbian and Bisexual Group of Boston ("GLIB") to participate in the Parade. In November, 1994, GLIB agreed to the City's motion that it be joined as a necessary party and it became a defendant.

In addition to incorporating the Veterans' usual themes of honoring St. Patrick, and celebrating the traditional Irish family and family values as the Veterans define them, the 1995 Parade is being planned to protest the decisions of the courts of the Commonwealth of Massachusetts that compelled the inclusion of GLIB in prior Parades, thus prompting the Veterans to cancel the 1994 Parade. On March 20, 1994, the date for which the cancelled Parade had been scheduled, a motorcade of over 800 vehicles travelled the Parade route, displaying black flags, to protest those decisions. In order to register the Veterans' dissent and to honor those who protested last year, the 1995 Parade will begin with a motorcade of vehicles exhibiting black flags, Parade officials will wear black armbands, rather than the traditional green attire, and each of the several divisions in the Parade will be led by a black flag.

Neither the City nor GLIB claim, and the court does not find, that the Veterans' planned protest is merely a pretext to invoke the jurisdiction of the federal courts and evade the permanent injunction, issued by the Superior Court of the Commonwealth of Massachusetts, which prevents the Veterans from excluding GLIB from the annual Parade based on its members' sexual orientation. Rather, after trial, this court has found that the Veterans' protest is a sincere and significant part of the planned 1995 Parade.

The decisions of the courts of the Commonwealth which resulted in the issuance of the injunction were based on their finding that the 1993 Parade had no discernible expressive purpose and was, therefore, a public accommodation subject to the Massachusetts anti-discrimination law, rather than conduct protected by the First Amendment. Both the Superior Court and the Supreme Judicial Court, however, expressly recognized that the relevant facts could change materially and a future Parade might be entitled to constitutional protection.

The Veterans exercised their right to initiate this action in federal court. If either the City or GLIB had moved to reopen the Supe-

rior Court case to seek a ruling that its injunction should operate to bar GLIB's exclusion from the 1995 Parade, this court would have abstained, as it did in 1993, and allowed the courts of the Commonwealth to decide the issues presented in this case. Neither defendant chose to do so. Indeed, in August 1994, GLIB declined a virtual invitation from the Superior Court to seek relief in that forum. Because there is not an ongoing state proceeding which a decision by this court will disrupt, and because the Veterans are now entitled to a ruling from some court on the merits of some of their constitutional claims concerning the 1995 Parade, there is not a proper basis for this court to abstain from deciding this case.

On January 6, 1994, the United States Supreme Court granted the Veterans' request to review the decision of the Supreme Judicial Court which held that the 1993 Parade was a public accommodation, rather than an exercise of the Veterans' First Amendment rights, and prohibited the exclusion of GLIB. The Supreme Court's action, however, has not relieved this court of the responsibility of deciding the instant case. The protest theme makes the 1995 Parade materially different than the 1993 Parade with regard to the Veterans' rights to associate for expressive purposes and to free speech. Thus, the Veterans could prevail on those claims with regard to the 1995 Parade, but not with regard to the 1993 Parade. Furthermore, the Supreme Court will not hear, let alone decide, the case concerning the 1993 Parade before March 19, 1995. If the Veterans have a First Amendment right to exclude GLIB from the 1995 Parade, the Veterans will be irreparably harmed if that right is not recognized and respected in time for the 1995 Parade to proceed.

Accordingly, the court has considered the issues presented by this case. The City has correctly contended that no controlling facts have changed since the Supreme Judicial Court's decision with regard to the alleged violation of the Veterans' right not to be compelled to express or foster a view that they find morally objectionable. Therefore, collateral estoppel operates and this district court does not have the power to decide that claim—on which the Veterans' counterparts prevailed in the litigation concerning the St. Patrick's Day Parade in New York City. The Supreme Court alone has the authority to address the Veterans' forced speech claim.

The sincere and significant protest which will be part of the 1995 Parade, however, gives the 1995 Parade the expressive purpose the courts of the Commonwealth previously found lacking and is, therefore, a new controlling fact concerning the Veterans' First Amendment rights to associate for expressive purposes and to free speech. Thus, collateral estoppel does not bar consideration of whether those rights would be violated by the compelled inclusion of GLIB in the 1995 Parade.

For the reasons described in detail in § IV.C of this Memorandum, conditioning the issuance of a permit for the 1995 Parade on the inclusion of GLIB would violate the Veterans' right to associate for expressive purposes; it is, therefore, not necessary, or on the present record appropriate, to decide whether their right to free speech is also infringed. The 1995 Parade will protest the decisions of the courts of the Commonwealth, which are matters of public concern. Speech addressing such matters is at the core of expression that the First Amendment is intended to protect. If GLIB's inclusion in the 1995 Parade were compelled, the Veterans' protest would be confused and muted; indeed, the Veterans' protest would be silenced because they would again cancel the Parade.

The right to associate for expressive purposes is important, but not absolute. Therefore, as prescribed by the Supreme Court, this court has also considered the degree to which the compelling public interest in combatting discrimination based on sexual orientation would be served by requiring GLIB's inclusion in the 1995 Parade.

In contrast to the cases decided by the Supreme Court, this matter does not involve the exclusion of members of GLIB from equal access to publicly available goods or services, or from opportunities for commercial success or professional advancement. Rather, exclusion from the 1995 Parade would deprive members of GLIB of an opportunity to proclaim that they are men and

women who are Irish as well as gay, lesbian, or bisexual. There are, however, alternatives available to GLIB to accomplish this objective. The evidence does not indicate that they could not march in other St. Patrick's Day parades throughout Massachusetts. In addition, another St. Patrick's Day event could be organized in Boston. In New York City, after the exclusion of a gay and lesbian group from the 1992 St. Patrick's Day parade was upheld by the federal court, that group held its own event, which attracted virtually all of New York City's elected officials.

The court recognizes, and regrets, that exclusion from the 1995 Parade will be personally painful to members of GLIB. This injury, however, is not sufficient to trump the Veterans' exercise of their First Amendment rights to associate in order to engage in symbolic speech. Speech found by the courts to be protected by the First Amendment is usually offensive to many who must endure it. Inoffensive speech rarely generates controversies requiring judicial intervention. The First Amendment has been held to protect the rights of protesters to burn the American flag and of Nazis to march through a community of Jewish Holocaust survivors. It also protects the right of the Veterans to protest the decisions of the courts of the Commonwealth, and to exclude GLIB as part of that protest.

As this case is, in meaningful measure, about messages, it is appropriate for this court to explicate certain messages which should not be received as a result of this decision. This decision should not be interpreted as a judicial endorsement of the Veterans' protest or of their decision to exclude GLIB from the 1995 Parade. It is axiomatic that the First Amendment protects speech without regard to the truth or social utility of the ideas expressed. Courts in our democracy are not empowered to assess the validity or value of particular speakers or speech. We depend on the competition of ideas and the ultimate wisdom of a free people for those judgments.

This decision also should not be construed as a suggestion that the gay, lesbian, and bisexual men and women of GLIB are not also authentically Irish and full members of the human family. These facts are self-evident. No judicial decision could alter them.

Nor should this decision be regarded as a comment on the correctness of the prior decisions of the courts of the Commonwealth concerning the unfortunately enduring dispute between the Veterans and GLIB. Only the Supreme Court can review the Supreme Judicial Court's decision regarding the 1993 Parade. It has agreed to do so. This court has addressed a materially different matter.

There is, however, one message that this decision should communicate. Those who founded this nation were committed to the principle that the proper response to what may be widely regarded as bad speech is not to silence it, but to respond to it with better speech. That faith is embodied in the First Amendment. That faith endures.

## II. PROCEDURAL HISTORY

### A. *Prior Litigation*

Litigation between GLIB, the Veterans, and the City commenced on March 10, 1992, when GLIB and one of its members filed a complaint, in the Suffolk Superior Court of the Commonwealth of Massachusetts, against the Veterans and various officials of the City of Boston. (*"GLIB v. City of Boston"*). The complaint alleged that the Veterans and the defendant City officials had violated GLIB's rights under the First Amendment of the United States Constitution, the Massachusetts Declaration of Rights, the public accommodation provisions of the Massachusetts Civil Rights Act, M.G.L. c. 272, §§ 92A, 98, (the "Public Accommodation" statute), and Massachusetts common law by excluding GLIB from participating as an identifiable group of gay, lesbian, and bisexual members of the Irish community in the March 14, 1992 St. Patrick's Day Parade. (the "1992 Parade"). GLIB alleged, among other things, that its exclusion would constitute unlawful discrimination, on the basis of sexual orientation, in a place of public accommodation, which is proscribed by M.G.L. c. 272, §§ 92A

and 98.[1] GLIB, therefore, sought a court order requiring the defendants to allow its members to march as an identifiable unit in the 1992 Parade.

As GLIB's complaint alleged both federal and state claims, the defendants had the opportunity to remove the case to federal court within 30 days of service of process. *See* 28 U.S.C. §§ 1331, 1441, 1446. No defendant, however, effected its removal.

On March 11, 1992, the Suffolk Superior Court issued the requested restraining order preventing the Veterans from excluding GLIB from the 1992 Parade. Order of March 11, 1992, *GLIB v. City of Boston,* No. 92–1518 (Suffolk Sup.Ct. Mar. 11, 1992) (Zobel, J.). On March 15, 1992, members of GLIB marched in the 1992 Parade.

On December 23, 1992, the Veterans obtained a permit for their annual Parade to be held on March 14, 1993 (the "1993 Parade"). In early January 1993, GLIB applied to participate as a unit in the 1993 Parade. The Veterans denied GLIB's request. On February 2, 1993, GLIB amended its still pending complaint to seek declaratory and injunctive relief concerning the 1993 Parade.

On February 19, 1993, after a hearing, the Superior Court found the annual Parade to be a "civic event" and preliminarily enjoined the Veterans from interfering with GLIB's participation in the 1993 Parade. Order of February 19, 1993, *GLIB v. City of Boston,* No. 92–1518 (Suffolk Sup.Ct., Feb. 19, 1993) (Zobel, J.). The Veterans petitioned a single Justice of the Massachusetts Appeals court for review. On March 1, 1993, the single Justice denied the Veterans' petition. Order of March 1, 1993, *GLIB v. City of Boston,* No. 93–J–138 (Mass.App.Ct., Mar. 1, 1993) (Brown, J.).

The Veterans then petitioned the Supreme Judicial Court for relief, pursuant to M.G.L. c. 21 § 3, and requested that its petition be heard by the full panel of the Supreme Judicial Court. The Supreme Judicial Court denied the Veterans' request for a hearing by the full panel. The matter was then heard by a single Justice, who denied the petition. Order of March 3, 1993, *GLIB v. City of Boston,* No. SJ–93–0081 (SJC, Mar. 3, 1993) (Wilkins, J.).

On March 9, 1993, five days before the scheduled 1993 Parade, the Veterans filed suit in the United States District Court for the District of Massachusetts against GLIB, the Mayor of Boston, and the three Massachusetts judicial officers who had ruled adversely to the Veterans. The Veterans alleged violations of the First Amendment of the United States Constitution and sought relief pursuant to 42 U.S.C. § 1983. That case was assigned to this court. On March 11, 1993, the federal case was dismissed because it constituted an impermissible effort to, in effect, appeal adverse decisions in ongoing state litigation to a United States District Court. *South Boston Allied War Veterans Council v. Zobel,* 830 F.Supp. 643, 644 (D.Mass.1993) (*"Zobel"*). Federal law provides that only the United States Supreme Court may review decisions of state courts, and may do so only when they are final. *Id.* at 646–48; 28 U.S.C. § 1257; *Rooker v. Fidelity Trust Company,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1982). In addition, even if this court had jurisdiction, principles of federalism and comity to which this court was, and remains, sensitive, required this court to abstain because granting the relief the Veterans were seeking— the right to exclude GLIB from the 1993 Parade—would have interfered substantially with the then ongoing litigation in the courts of the Commonwealth, which implicated important state interests. *Zobel,* 830 F.Supp. at 648–651; *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

On April 16, 1993, the Veterans filed an answer to the amended 1992 Complaint in Suffolk Superior Court, and crossclaimed, alleging that the City had violated the Veterans' "rights of freedom of speech, assembly, and association," and had impermissibly threatened, intimidated or coerced the Veter-

---

1. M.G.L. c. 272, §§ 92A and 98, in pertinent part, prohibit "any distinction, discrimination or restriction on account of ... sexual orientation ... in any place of public accommodation, resort or amusement ..."

ans' right to free exercise of religion and equal protection, in violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H, I.

In November 1993, the Superior Court (Flannery, J.) conducted a four-day, non-jury trial. The Veterans asserted their First Amendment rights as defenses to GLIB's claims, contending that these rights precluded the application of the Public Accommodation statute to the 1993 Parade and, in any event, that the Parade did not constitute a public accommodation under Massachusetts law. In so doing, the Veterans specifically invoked three separate bases for First Amendment protection: freedom of speech, the right to associate for expressive purposes, and the right not to be compelled to express or foster views in which the Veterans did not believe. *See* Defendants' Memorandum in Support of Proposed Findings of Facts and Proposed Conclusions of Law, *GLIB v. City of Boston,* No. 92–1518 (Suffolk Sup.Ct.) at 2, 10.

On December 15, 1993, the Superior Court issued its decision, finding that the Veterans' annual St. Patrick's Day Parade was a public accommodation under M.G.L. c. 272, §§ 92A and 98, and that the Veterans' First Amendment rights were not implicated by the facts concerning the 1992 and 1993 Parades. Findings of Facts, Rulings of Law, and Order of Judgment, *GLIB v. City of Boston,* No. 92–1518 (Suffolk Sup.Ct. Dec. 15, 1993) (Flannery, J.) at 11, 30. ("Superior Court Decision") The Superior Court noted that "[f]or at least the past 47 years, the Parade has traveled the same basic route along the public streets of South Boston, providing entertainment, amusement and recreation," *id.* at 6, and has traditionally celebrated both St. Patrick's Day and General George Washington's success in driving the British from South Boston on March 17, 1776. *Id.* at 10. The Superior Court also found that the Veterans did not generally inquire into the specific messages of the groups which applied to march, had no written standards or procedures for selecting participants, and were not genuinely selective in choosing the diverse groups which participated in the Parade. *Id.* at 7–9. Thus, the Superior Court held that:

Given the lack of selectivity exerted by the Veterans over the Parade participants and sponsors, as well as the Parade's historical roots, . . . the Parade is a public event. *Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination,* 402 Mass. 716, 721 [524 N.E.2d 1364] (1988). As such, . . . the Parade constitutes a public accommodation within the meaning of M.G.L. c. 272, § 92A. *Id.* at 11.

. . . . .

Given the Veterans lack of selectivity in choosing participants and failure to circumscribe the marchers' messages, it is impossible to discern any specific expressive purpose entitling the Parade to protection under the First Amendment. *Id.* at 30.

Nevertheless, the Superior Court went on to state: .

Even if the statute does work some slight infringement on the Veteran's right of expressive association, that infringement is justified by the State's interest in eradicating sexual orientation discrimination. *Board of Directors of Rotary International v. Rotary Club of Duarte,* 481 U.S. 537, 549 [107 S.Ct. 1940, 1947–48, 95 L.Ed.2d 474] (1987) ("*Rotary*"); *Roberts v. United States Jaycees,* 468 U.S. 609, 623 [104 S.Ct. 3244, 3252–53, 82 L.Ed.2d 462] (1984). *Id.*

The Superior Court also found that the sexual orientation of GLIB's members was the reason for its exclusion from the Parade and that the Veterans' "shifting explanations for excluding GLIB demonstrate the pretextual nature of these excuses." *Id.* at 4. It held that the Veterans could not exclude GLIB from the 1993 Parade on this basis. *Id.* at 11. However, in denying the Veterans' claim that the proposed exclusion of GLIB was constitutionally protected, the Superior Court stated that, "[t]his is not to say . . . that the Parade can never become a protected First Amendment activity. It simply has not been one in the past and is not one now." *Id.* at 31 n. 27.

As a result of these findings, the Superior Court entered judgment on December 24, 1993. Despite the express recognition that

the Parade might in the future become an activity protected by the First Amendment, the Order *"permanently* enjoined [the Veterans] from discriminating against [GLIB] on the basis of sexual orientation with respect to participation in the [Veterans'] *annual* St. Patrick's Evacuation Day Parade." *See* Judgment, *GLIB v. City of Boston,* No. 92–1518 (Suffolk Sup.Ct. Dec. 24, 1993) (emphasis added). The Order also required that the Veterans "accommodate in the Parade in all respects representatives of [GLIB] on the terms and conditions generally applicable to all other Parade participants." *Id.* The City was ordered to remain as a party to ensure effective relief. *Id.*

The Veterans appealed the Superior Court's decision to the Supreme Judicial Court and were granted direct appellate review. Before the Supreme Judicial Court, the Veterans again argued that the Parade constituted expressive conduct protected by the First Amendment, asserting their rights to free speech, expressive association, and to not be compelled to communicate or foster views in which the Veterans did not believe. *See* Brief for Defendant–Appellants, *GLIB v. City of Boston,* No. 92–1518 (SJC No. S–06498) at 19–24, 26–31.

On March 11, 1994, the Supreme Judicial Court affirmed the decision of the Superior Court. *See GLIB v. City of Boston,* 418 Mass. 238, 636 N.E.2d 1293 (1994), *cert. granted,* —— U.S. ——, 115 S.Ct. 714, 130 L.Ed.2d 621 (1995). More specifically, the SJC upheld the trial court's findings of fact because they were not clearly erroneous. *Id.* 418 Mass. at 247–48, 636 N.E.2d 1293. Therefore, the Supreme Judicial Court stated that:

[W]e need not decide whether the free speech rights or the expressive association right, or both, might be implicated by the factual situation asserted by the defendants. This is so because, as the judge found, it is "impossible to discern any specific expressive purpose entitling the Parade to protection under the First Amendment."

*Id.* at 249, 636 N.E.2d 1293. The Supreme Judicial Court did not discuss or affirm the Superior Courts' finding that any slight in-

fringement on the Veterans' right of expressive association was justified by the State's interest in combatting discrimination. Rather, the Supreme Judicial Court expressly stated that:

We do not suggest that every parade is nonexpressive or that every parade is necessarily a place of public accommodation. Rather, we base our conclusions on the unique nature of the facts found as to the parade in controversy. *Id.* at 250 n. 18, 636 N.E.2d 1293.

\* \* \* \* \* \*

We leave open for an appropriate case the question whether the public accommodation law permissibly could be applied to a genuine exercise of First Amendment rights. *Id.* at 252 n. 21, 636 N.E.2d 1293.

The Supreme Judicial Court also addressed the Veterans' claim that requiring the inclusion of GLIB in the Parade would violate the Veterans' right not to be forced to communicate or foster a view in which they did not believe. The dissent, relying on the Supreme Court's decision in *Wooley v. Maynard,* 430 U.S. 705, 715, 97 S.Ct. 1428, 1435–36, 51 L.Ed.2d 752 (1977), stated that such a violation had been demonstrated. *Id.* 418 Mass. at 255–56, 636 N.E.2d 1293 (Nolan, J., dissenting). In a footnote, the majority stated and briefly explained its conclusion that "[t]he dissent's reliance on *Wooley v. Maynard* is misplaced." *Id.* at 251 n. 19, 636 N.E.2d 1293.

As a result of the Supreme Judicial Court's decision, the Veterans cancelled the 1994 Parade. However, on March 20, 1994, the date for which the Parade had been scheduled, a motorcade of over 800 vehicles traveled the Parade route, displaying black flags, to protest the decisions of the courts of the Commonwealth which prompted the Parade's cancellation.

On April 20, 1994, the Veterans applied to the Boston Transportation Department for a permit to hold a St. Patrick's Day Parade on March 19, 1995. The application indicated that the 1995 Parade would have three themes: (1) to honor St. Patrick; (2) to celebrate the role of traditional families in Irish history; and (3) "to commemorate the

support by the people of South Boston who supported the Veterans' rejection of judicially imposed messages on the parade of Sunday, March 20, 1994." Letter from John Hurley to Frank Tramontozzi dated April 20, 1994, at 1. On May 2, 1994, the City declined to act on the Veterans' request, deeming it premature because it had been filed eleven months prior to the Parade and because the Veterans were planning to seek further review of the Supreme Judicial Court's decision. In addition, the City indicated that it would not issue the permit unless the Veterans certified that they would comply with the Superior Court's permanent injunction and not exclude GLIB from the 1995 Parade.

On July 25, 1994, the Veterans filed a Petition for Rehearing with the Supreme Judicial Court. The Supreme Judicial Court denied that petition on July 26, 1994.

On July 12, 1994, the Veterans filed a petition for certiorari, requesting that the United States Supreme Court review and reverse the Supreme Judicial Court's decision concerning the 1993 Parade. On January 6, 1995, the Supreme Court granted the petition. The court understands that the case will not be argued before March 19, 1995.

## B. *This Litigation*

On July 12, 1994, the Veterans instituted the instant action. They allege that the City and its Mayor, Thomas Menino, are violating the Veterans' First Amendment rights by refusing to issue a permit for the 1995 Parade. The Veterans seek a declaratory judgment holding that the defendants are violating their constitutional rights by denying them a permit for the 1995 Parade by, in effect, conditioning its issuance on the Veterans' promise to let GLIB participate; an injunction mandating issuance of a permit for the 1995 Parade; and attorneys' fees. The Veterans did not make GLIB a party to this case.

Nor did GLIB seek to intervene in this action. Rather, GLIB promptly moved, in the Superior Court, to have the Veterans held in contempt of the permanent injunction for attempting to secure a permit for a 1995 Parade from which they intended to exclude GLIB. The motion was not granted. In the course of the hearing, however, the Superior Court suggested that GLIB could seek to intervene in this federal case. *See GLIB v. City of Boston,* August 23, 1994 Hearing Transcript ("Tr.") at 16, 17. The Superior Court also stated that GLIB could move for supplemental relief concerning the 1995 Parade in the Superior Court. *Id.* at 17. GLIB's counsel suggested that the permanent injunction be revised to explicitly prevent the City from issuing a permit for the 1995 Parade unless the Veterans certified their compliance with it. *Id.* at 31. The Court responded that revision of the injunction was not an issue to be decided on a motion for civil contempt, and that GLIB should make a further filing if it wished to seek such relief. *Id.* at 31–32.

GLIB again did not seek to intervene in the present case. More significantly, GLIB did not accept the Superior Court's virtual invitation to reopen the state court litigation to address the issues presented by the facts concerning the proposed 1995 Parade. As discussed, in § IV.A.1, *infra,* if that concluded litigation had been reopened, there would be a proper basis for this court to abstain to permit the Superior Court to decide this dispute. In such circumstances, this court would have abstained. However, since neither the Veterans, the City, nor GLIB chose to return to the Superior Court to litigate the significant issues raised by the 1995 Parade, this court is required to address them.

In any event, the City and the Mayor moved to dismiss this case, asserting that collateral estoppel bars consideration of the merits of the Veterans' claims.[2] As the Superior Court noted in the course of the contempt proceedings, *id.* at 16–18, and as discussed in § IV.B, *infra,* a factual inquiry is necessary to determine whether any "controlling facts" have changed and, therefore,

---

2. The City also initially asserted that this court should abstain from deciding this case, but with- drew this argument.

whether collateral estoppel bars consideration of the merits of any or all of the Veterans' claims concerning the 1995 Parade. Thus, the motion to dismiss was denied.[3]

The parties were permitted to take the limited discovery they requested, the deposition of the Veterans' representative John Hurley. The parties then filed cross-motions for summary judgment; agreed that the court could consider their submissions as the basis for deciding the case as a trial on a stipulated record; and agreed that the court could supplement that record with testimony if deemed necessary to a properly informed decision.

The parties briefed the collateral estoppel issue. Asserting that it was only seeking guidance as to whether to issue the Veterans an unconditional permit for the 1995 Parade, the City declined to address the merits of the case if the court found that any or all of the Veterans' claims were not barred by collateral estoppel.

Several days before the trial, scheduled for November 29, 1994, the City moved to join GLIB as an necessary party pursuant to Fed.R.Civ.P. 19(a). The Veterans opposed the motion. GLIB appeared on November 29, 1994, and represented that it did not object to being joined as a defendant. As it appeared that complete relief between the Veterans and the City could not be afforded without GLIB's participation, because GLIB's absence created the risk that the City would be subjected to inconsistent orders, and because GLIB had an interest in this litigation that would be affected and possibly impaired by the decision in this case, the City's motion to join GLIB was allowed. GLIB agreed that no further discovery was necessary. GLIB requested only an oppor-

tunity to submit a memorandum urging the court to abstain from deciding this matter and agreed that, if necessary, the trial could be conducted on the previously stipulated record, supplemented by any testimony the court might request. GLIB, however, declined the court's request that it address the merits of the Veterans' claims.[4]

On December 14 and 15, 1994, the court heard argument on the issues of abstention and collateral estoppel, and testimony from David O'Connor, representing GLIB, and John Hurley, on behalf of the Veterans. The case, therefore, has been tried on a partially stipulated record, supplemented by the testimony of Messrs. O'Connor and Hurley.

This court believes that it is usually preferable that constitutional controversies concerning the conduct of public officials be settled on appropriate terms, rather than decided by the courts. *See Spacco v. Bridgewater School Department,* 739 F.Supp. 30, 34–39 (D.Mass.1990). Accordingly, from the inception of this case and continuing through its trial, the court encouraged the parties to seek a mutually agreeable basis for resolving this dispute. That effort was unsuccessful. Thus, this court's decision on the issues presented is required.

## III. FACTS

The following facts are either undisputed or proven by a preponderance of the evidence. Additional undisputed or proven facts are included where relevant throughout this Memorandum.

The Veterans are seeking a permit to conduct a parade on March 19, 1995, which will have three themes: (1) to honor St. Patrick, the Catholic Patron Saint of Ireland and of

---

3. The court did, however, dismiss the case against the Mayor in his individual capacity because there were no claims asserted requiring relief to be performed by the Mayor personally.

4. At the December 14 and 15, 1994 hearings the court pointed out that it had afforded the City and GLIB a full and fair opportunity to address all of the issues presented, including the merits of the Veterans' claims. *See, e.g.,* Dec. 15, 1994 Tr. at 3. The defendants persisted, however, in their unwillingness to do so. This failure of the adversary system has complicated the court's task in deciding this case. The court does not,

however, attribute the defendants' declination to recalcitrance. The City evidently does not wish to be perceived as preferring that either party prevail in this politically charged dispute. It appears that GLIB's decision not to reopen the Superior Court case or to address the merits of this case reflects an appreciation for the unfortunate fact that to the extent that GLIB's goal is to attain genuine recognition and acceptance by the Veterans and their sympathizers, combative litigation, particularly successful litigation, may be counterproductive.

the Archdiocese of Boston; (2) to celebrate the Veterans' view of the important role of traditional Irish families and family values; and (3) to protest the decisions of the courts of the Commonwealth which compelled the inclusion of GLIB in prior Parades, while honoring the people who engaged in the motorcade on March 20, 1994 to protest those judicial decisions.

The first two themes, honoring St. Patrick and traditional family values, have been the themes of the previously litigated Parades. The theme of protesting the decisions of the courts of the Commonwealth and honoring those who protested last year is new.

Neither the City nor GLIB assert that the new protest theme is not genuine. Nor do they claim this new theme is merely a pretext to invoke federal jurisdiction and evade the Superior Court's permanent injunction. Nevertheless, this court has been skeptical about whether the protest theme is sincere and significant. Having considered all of the evidence, and having had the opportunity to assess the credibility of Mr. Hurley's testimony, the court is persuaded that the protest theme proposed for the 1995 Parade is sincere. It will also be a significant part of the event. The 1995 Parade, if held, will be much smaller than past Parades because the Veterans have not had a full year to raise money and recruit participants. It will begin with a motorcade of vehicles exhibiting black flags. Parade officials will wear black armbands, rather than the traditional green attire. Each of the several divisions in the Parade will be led by a black flag. These symbols are intended to communicate the Veterans' protest of the decisions of the courts of the Commonwealth, and will be so understood by those who observe them.

The Veterans do not intend to require that any marching unit adopt its themes or express any particular message. Groups that do not have any Irish, family, patriotic, or protest messages may, as in the past, be admitted to march in an "open" category.

For the first time, however, the Veterans have adopted written standards and regulations (the "Regulations") to obtain information about applicants and their banners, and to govern admission to the 1995 Parade. The additional information about applicants and their proposed messages will be used by the Veterans in an effort to ensure that no participating unit will communicate a message which is inconsistent with any of the Veterans' three themes.

Although they have not previously had written standards and procedures, the Veterans have in the past rejected applicants whose message they deemed unsuitable. Such groups include the Ku Klux Klan, Restore Our Alienated Rights ("ROAR"), a South Boston anti-busing group, and GLIB.

If a permit is granted to the Veterans, GLIB intends to apply to march in the 1995 Parade. It proposes to march behind a banner displaying pink triangles, green shamrocks, and the words "Irish–American Gay, Lesbian and Bisexual group of Boston." This is the same banner behind which GLIB marched in previous Parades. Marching behind this banner, GLIB would be widely recognized by observers as the group which prevailed in the prior litigation concerning the Parade. While GLIB is willing to compromise somewhat with regard to the wording of its banner, it will insist on marching as a unit identifiable as a group of gay, lesbian, and bisexual men and women of Irish descent.

The Veterans' intend to reject GLIB's application because they believe that GLIB's participation in the 1995 Parade is utterly inconsistent with, and would make a mockery of, their protest. If required to include GLIB in the event, the Veterans will not conduct the 1995 Parade. However, even in the absence of their protest theme, the Veterans would reject GLIB's request to participate because the Veterans do not want to march with what Mr. Hurley characterized as a "radical gay-lesbian group." Deposition of John Hurley, ("Hurley Dep.") October 12, 1994, at 78. The Veterans do not, however, object to gay, lesbian, or bisexual individuals marching individually, without identifying their sexual orientation, or as parts of other participating units. The court finds that GLIB's participation in the 1995 Parade would confuse and mute the protest the Veterans wish to express. If GLIB's inclusion is

ordered by the court, that protest will be silenced because the Veterans will not conduct the 1995 Parade.

## IV. ANALYSIS

### A. *Abstention*

#### 1. *Younger*

■ Contrary to GLIB's contention, this case may not be dismissed pursuant to the principles promulgated by the Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. *Younger* and the cases which have emerged from it hold that principles of federalism and comity require district courts to abstain from granting relief whenever doing so would interfere with *ongoing* state proceedings involving important state interests. *See Bettencourt v. Board of Registration*, 904 F.2d 772, 777 (1st Cir.1990); *Zobel*, 830 F.Supp. at 648–51. More specifically, *Younger* abstention is required when: (1) there are ongoing state judicial proceedings; (2) the state proceedings implicate important state interests; (3) the state proceedings afford an adequate opportunity to raise federal constitutional challenges; and (4) the plaintiff in the federal case has not demonstrated "bad faith, harassment, or any other unusual circumstances that would call for equitable relief." *Bettencourt*, 904 F.2d at 777, 779, *quoting, Younger*, 401 U.S. at 54, 91 S.Ct. at 755. In the instant case, there are no "ongoing" state proceedings. There is, therefore, no basis for *Younger* abstention.

■ The pendency of the Superior Court injunction barring the Veterans from excluding GLIB from their annual St. Patrick's Day Parade is not an ongoing state proceeding for the purposes of *Younger*. The decision issuing the injunction has been appealed, and the state appellate process is complete.

This case is, therefore, decisively different than *Romany v. Colegio De Abogados De Puerto Rico*, 742 F.2d 32 (1st Cir.1984). *Romany* involved the question whether it was constitutionally permissible for Puerto Rico to require attorneys to be members of an integrated bar association when their dues were used in part to support the advocacy of positions on matters of public policy with which they disagreed. *Id.* at 35. The Supreme Court of Puerto Rico upheld the mandatory membership. *Id.* However, it ordered the defendant bar association to devise, within one year, a method for assuring that the dues of dissenting members would not be used for ideological purposes and expressly retained jurisdiction in order "to approve, disapprove or finally modify the remedy" proposed. *Id.* at 36. Two attorneys who were disbarred following the Supreme Court of Puerto Rico's ruling subsequently instituted suit in the United States District Court. *Id.* at 37. The district court heard the case and held that the operation of the integrated bar violated the plaintiffs' rights under the United States Constitution. *Id.* at 38. The Court of Appeals for the First Circuit reversed and held that the district court should have abstained because "[t]he Supreme Court of Puerto Rico has yet to complete its remedial action." *Id.* at 40. The Court of Appeals also noted, however, that "[t]he district court may proceed after the Supreme Court of Puerto Rico has finally determined what remedy to provide ..." *Id.* at 44.

In the instant case, there are no pending proceedings in the courts of the Commonwealth. As described earlier, the Veterans in this case assert that the protest theme of the 1995 Parade provides them with a First Amendment right to exclude GLIB even if they did not have such a right previously. They are seeking a declaration of this right and, pursuant to 42 U.S.C. § 1983, an injunction preventing the City from conditioning the issuance of a Parade permit on the inclusion of GLIB. The Veterans could have raised these claims and sought this relief in the courts of the Commonwealth. They were not, however, required to do so. "The Supreme Court ... has held expressly that [42 U.S.C. § 1983] claimants need not avail themselves of state judicial and administrative remedies before going to federal court." *Kercado–Melendez v. Aponte–Rogue*, 829 F.2d 255, 259 (1st Cir.1987), *cert. denied*, 468 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988), *citing, Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Steffel v. Thompson*, 415

U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

GLIB could have reopened the Superior Court litigation by seeking relief regarding the 1995 Parade under the permanent injunction. As explained previously, GLIB declined a virtual invitation of the Superior Court to do so. If GLIB had accepted that invitation, there would be ongoing state court proceedings providing a forum to adjudicate fully and fairly the Veterans' claims concerning the 1995 Parade. In view of the state courts' involvement in the prior disputes between the Veterans and GLIB, this court would have abstained pursuant to *Younger*. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929, 95 S.Ct. 2561, 2566–67, 45 L.Ed.2d 648 (1975). Because of GLIB's inaction, however, there is no ongoing state proceeding to which this court may defer.

Similarly, the fact that the Veterans filed a petition for certiorari, which has been granted by the Supreme Court, does not mean that litigation concerning the 1995 Parade is continuing in the courts of the Commonwealth, as would be required to justify *Younger* abstention. There is no reported case in which *Younger* has been deemed applicable because of the pendency of a petition for certiorari. Rather, *Younger* does not apply when state proceedings are completed by the time a United States District court is asked to act because no pending state litigation will be enjoined or disrupted. *See Guarino v. Larsen*, 11 F.3d 1151, 1156 n. 1 (3d. Cir. 1993). As the Supreme Court has explained, *Younger* is based on the principle that:

> The *State's* trial-and-appeals process is treated as a unitary system, and for a federal court to disrupt its integrity by intervening in mid-process would demonstrate a lack of respect for the State as sovereign.

*New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 369, 109 S.Ct. 2506, 2518, 105 L.Ed.2d 298 (1989) (emphasis added). Accordingly, the Supreme Court went on to state that:

> "[A] necessary concomitant of *Younger* is that a party [wishing to contest in federal court the judgment of a state judicial tribunal] must exhaust his *state* appellate remedies before seeking relief in the District Court."

*Id.* at 369, 109 S.Ct. at 2519, *quoting, Huffman v. Pursue, Ltd.* 420 U.S. 592, 608, 95 S.Ct. 1200, 1210, 43 L.Ed.2d 482 (1975) (emphasis added).

The Veterans have exhausted their state appellate remedies with regard to the 1993 Parade. There are not ongoing proceedings in the courts of the Commonwealth which a decision by this court will disrupt. Thus, the exercise of jurisdiction by this court, if otherwise appropriate, would not demonstrate a lack of respect for the sovereignty of the Commonwealth.

This court understands, of course, that the Supreme Court is the only federal court empowered to review and possibly reverse a decision by the Supreme Judicial Court of Massachusetts. *See Zobel,* 830 F.Supp. at 646–48. In the instant case, however, this court is not asked to decide whether the courts of the Commonwealth correctly decided the Veterans' claims concerning the 1993 Parade; that question will be resolved by the Supreme Court. This case involves the 1995 Parade. As explained in the discussion of collateral estoppel, in § IV.B, *infra,* the Veterans have been obliged to demonstrate that the proposed 1995 Parade is materially different than the 1993 Parade in order to obtain consideration by this court of the merits of their constitutional claims. They have satisfied their burden by showing that the protest theme of the 1995 Parade is a new, "controlling fact" with regard to their First Amendment rights to associate for expressive purposes and to free speech, but not with regard to their forced speech claim. Accordingly, the Veterans have demonstrated that the instant case is sufficiently different than the case which will be decided by the Supreme Court to permit this court to rule on some of the Veterans' claims.

Nevertheless, this court has considered whether it should stay this case and defer ruling until the Supreme Court renders its decision concerning the 1993 Parade. It would certainly be helpful for this court to have the guidance that the Supreme Court's decision will provide. However, as the cases

are factually distinct in ways which may make a decisive difference, and because collateral estoppel bars this court from deciding the Veterans' forced speech claim, which is based on *Wooley v. Maynard* and may be at the heart of the Supreme Court's decision, that decision alone will not conclusively determine the Veterans' First Amendment rights with respect to the 1995 Parade.

Most significantly, however, the Supreme Court will not hear, let alone decide, the case concerning the 1993 Parade prior to the Parade the Veterans seek to conduct on March 19, 1995. If this court does not now decide this case, the City will not issue the Veterans a permit for the 1995 Parade. As explained in § IV.C, *infra*, the 1995 Parade involves a protest which is protected by the First Amendment. The Veterans undoubtedly wish to register that protest before the Supreme Court hears its case. As the Supreme Court has recognized, "[t]he timeliness of political speech is particularly important." *Elrod v. Burns*, 427 U.S. 347, 374 n. 29, 96 S.Ct. 2673, 2690 n. 29, 49 L.Ed.2d 547 (1976); *see also Carroll v. Princess Anne*, 393 U.S. 175, 182, 89 S.Ct. 347, 352, 21 L.Ed.2d 325 (1968) ("The present case involves a rally and 'political' speech in which the element of timeliness may be important.") In any event, "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373–74, 96 S.Ct. at 2689–90, citing, *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971);[5] *see also Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st. Cir.1987); *Matter of Providence Journal Co.*, 820 F.2d 1342, 1352 (1st Cir.1986). Accordingly, notwithstanding the Supreme Court's granting of the Veterans' petition for certiorari, *Younger* does not provide a basis for this court to abstain from deciding this case.

### 2. *The Declaratory Judgment Act*

■ The fact that *Younger* does not compel abstention however, has not ended this court's consideration of whether it should decide this case. The Veterans are seeking a declaratory judgment.

> [D]eclaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201 is discretionary. (citation omitted.) The federal courts' obligation to decide virtually all questions within their jurisdiction is, to that extent, curtailed when complainants seek declaratory relief.

*El Dia, Inc. v. Hernandez–Colon*, 963 F.2d 488, 493 (1st Cir.1992); *see also, Rivera–Puig v. Garcia–Rosario*, 983 F.2d 311, 320 (1st Cir.1992) (federal court's duty to exercise its jurisdiction is relaxed in declaratory judgment actions); *United States v. Commonwealth of Pennsylvania*, 923 F.2d 1071, 1073–74, (3d Cir.1991) (discretion under Declaratory Judgment Act is significantly greater than under *Colorado River*); *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590 (5th Cir.1994) (district court has broad discretion under Declaratory Judgment Act in deciding whether to entertain the action). Therefore, although neither defendant requested it, this court has considered whether it should exercise its discretion to decline to decide this case. *See El Dia*, 963 F.2d at 498 n. 11 (federal court must "independently satisfy itself about the suitability of granting relief under the Declaratory Judgment Act.")

The Court of Appeals for the First Circuit has developed a series of factors to be applied by a court in deciding whether to exercise its "bounded discretion", *id.* at 494, in suits, such as the instant case, which are equitable in nature. *Id.* at 493–97; *see also, Rivera–Puig*, 983 F.2d at 320, 322 n. 16. The factors considered in *El Dia* and similar cases have previously been applied only where, in contrast to the instant case, there were pending, parallel state proceedings involving the same or similar issues at the time the federal suit was filed. *See, e.g., Rivera–Puig*, 983 F.2d at 315, 319; *Trejo*, 39 F.3d at 590; *Travelers Ins. Co. v. Louisiana Farm*

---

5. In *New York Times,* Justice William Brennan stated that even when a temporary restraining order is issued for the limited purpose of allowing a court to review a newspaper's First Amendment claim more thoroughly, the resulting pre-publication delay violates the First Amendment if the newspaper is entitled to prevail on the merits. 403 U.S. at 727, 91 S.Ct. at 2148 (Brennan, J., concurring).

*Bureau Federation, Inc.,* 996 F.2d 774, 777 (5th Cir.1993); *United States v. Commonwealth of Pennsylvania,* 923 F.2d at 1074. They are, however, also instructive in this case. Consideration of the relevant factors persuades the court that it would not be appropriate at this point to decline to decide the Veterans' request for declaratory relief. The most significant of those factors are addressed below.

As indicated earlier, the historic role of the courts of the Commonwealth in the prior disputes between Veterans and GLIB would militate in favor of deferring to the state courts if GLIB or the City had acted to reopen the Superior Court litigation. However, unlike the situation when the Veterans first appeared before this court, the courts of the Commonwealth have now authoritatively interpreted the Massachusetts Public Accommodation law and held that it applies to certain parades. *Compare Zobel,* 830 F.Supp. at 650 (Massachusetts courts may decide the statute does not apply to parades) *with GLIB v. City of Boston,* 418 Mass. at 247–48, 636 N.E.2d 1293 (1993) (Parade constitutes a public accommodation within the meaning of the statute). In contrast to 1993, therefore, there is now no hope that a limiting construction of the statute by the state courts will avoid the necessity of deciding the federal constitutional questions presented by this case. *See Zobel,* 830 F.Supp. at 650. Moreover, as discussed in the collateral estoppel analysis, § IV.B, *infra,* the decisions of the courts of the Commonwealth provide guidance to this court concerning the defining features of a parade that constitutes a public accommodation under the Massachusetts statute. The issue whether the Public Accommodation statute is constitutional as applied to the 1995 Parade is ripe for adjudication because the City will not issue the Veterans a permit unless they certify that they will comply with the Superior Court's permanent injunction. *See, e.g., W.R. Grace & Co. v. United Stated Environmental Protection Agency,* 959 F.2d 360, 364 (1st Cir. 1992) (holding that a claim is ripe when the challenged action is final and creates a direct or immediate dilemma for the parties.)

Some courts have found that § 1983 cases involving First Amendment rights, among others, are not good candidates for abstention because those federal constitutional rights are so important that federal courts should not, except in extreme circumstances, refuse to hear them. *See Corporacion Insular de Sequros v. Garcia,* 680 F.Supp. 476, 479 (D.P.R.1988), *citing, Baggett v. Bullitt,* 377 U.S. 360, 379, 84 S.Ct. 1316, 1326–27, 12 L.Ed.2d 377 (1964), and *Dombrowski v. Pfister,* 380 U.S. 479, 492, 85 S.Ct. 1116, 1124, 14 L.Ed.2d 22 (1965). Nevertheless, this court remains of the view that *if* their jurisdiction had been invoked in a timely manner, the courts of the Commonwealth would have fully and fairly decided the federal constitutional issues presented in this case.

At this moment, however, there is not time for the courts of the Commonwealth to provide an adequate remedy to vindicate the Veterans' First Amendment rights, which will be irreparably injured if not addressed by this court. *See El Dia,* 963 F.2d at 497. The City promptly withdrew its original claim that this court should abstain from exercising its jurisdiction, and has relied solely on the defense of collateral estoppel. The issue of abstention was first argued, in December 1994, by GLIB, which asserted only that *Younger* required abstention. Although the court has now independently discerned the question of whether the exercise of discretionary jurisdiction under the Declaratory Judgment Act is appropriate, time is of the essence in deciding this dispute. It usually takes the Veterans a year to plan a Parade. As described in § IV.C, *infra,* the Constitution provides the Veterans the right to exclude GLIB from the 1995 Parade as part of their protest. If the Veterans were, in December 1994 or now, compelled to initiate action in the Superior Court, there would be a grave risk that the case would not be resolved promptly enough to permit the 1995 Parade to proceed. Thus, in contrast to *El Dia,* this is a case where the present lack of an effective alternative forum and the significant risk of irreparable harm to the Veterans' First Amendment rights make it appropriate for this court to retain jurisdiction. *Id.; see also Metropolitan Property & Liability Ins. Co. v. Kirkwood,* 729 F.2d 61, 64

(1st Cir.1984) ("the reasons for granting a [declaratory] judgment are stronger where . . . the alternative appears neither simple nor totally adequate").

### 3. *The Anti–Injunction Act and Removal Statute*

■ Maintenance of this action does not violate the Anti–Injunction Act, 28 U.S.C. § 2283, which prohibits a United States court from issuing an injunction to stay state court proceedings except as expressly authorized by Congress, or in other special circumstances. Actions brought under 42 U.S.C. § 1983 are "expressly authorized" exceptions to the Anti–Injunction Act. *Mitchum v. Foster,* 407 U.S. 225, 243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). The fact that GLIB's prior case in the courts of the Commonwealth was also a § 1983 action does not qualify this conclusion.

■ Nor does the continuation of this case violate the federal removal statute, 28 U.S.C. § 1446. As described in the following analysis concerning collateral estoppel, this case does not, in effect, constitute a belated effort to remove the litigation concerning the 1993 Parade to federal court. *Compare Zobel,* 830 F.Supp. at 644–45, 651. Rather, the protest theme of the 1995 Parade is a new controlling fact, which permits certain of the Veterans' First Amendment claims to be litigated in this case.

### B. *Collateral Estoppel*

The courts of the Commonwealth of Massachusetts found that the 1993 Parade was a public accommodation, rather than an exercise of First Amendment rights by the Veterans, and that under Massachusetts law GLIB could not be excluded from that event because of its members' sexual orientation. The City asserts that the Veterans are collaterally estopped from relitigating these issues with regard to the 1995 Parade. This question requires careful consideration of the facts on which the prior decisions were based.

As described previously, the Superior Court found that the 1993 Parade was a public accommodation because: the Parade had historically been a public celebration; the Veterans had no written criteria or procedures for selecting participants; the Veterans did not generally inquire into the specific messages or views of each applicant; and the Veterans were not generally selective with regard to participants. Superior Court Decision at 9–11. The Superior Court concluded that the Veterans had excluded GLIB from the 1993 Parade because of the sexual orientation of GLIB's members. *Id.* at 4, 9–11. The Superior Court also found that the Veterans had not proven that the Parade constituted conduct protected by the First Amendment because in view of the "Veterans' lack of selectivity in choosing participants and failure to circumscribe the marchers' messages, it [was] impossible to discern any specific expressive purpose entitling the Parade to [such] protection." *Id.* at 30. Nevertheless, the Superior Court went on to state that: "[e]ven if the statute does work some slight infringement on the Veterans' right of expressive association, that infringement is justified by the State's interest in eradicating sexual orientation discrimination." *Id.* As a result of these rulings, the Superior Court held that the Veterans' exclusion of GLIB from the 1993 Parade, based exclusively on the sexual orientation of GLIB's members, violated the Massachusetts Public Accommodation statute and was impermissible. *Id.* at 11.

The Supreme Judicial Court accepted certain facts found by the Superior Court because they were not "clearly erroneous," but did not address or affirm all of the Superior Court's findings. *GLIB v. City of Boston,* 418 Mass. at 247–48, 636 N.E.2d 1293. More specifically, the Supreme Judicial Court accepted the findings that: the 1993 Parade was a public accommodation within the meaning of the statute, 418 Mass. at 248, 636 N.E.2d 1293; that GLIB was being excluded because of its members' sexual orientation, *id.* at 242, 636 N.E.2d 1293; and that it was "impossible to discern any expressive purpose entitling the Parade to protection under the First Amendment," *id.* at 249, 636 N.E.2d 1293. Relying on this lack of a discernible expressive purpose, the Supreme Judicial Court did not address or decide whether the Veterans' rights to free speech or

expressive association would be violated by the inclusion of GLIB in the 1993 Parade. *Id.* at 249, 636 N.E.2d 1293. Rather, the Supreme Judicial Court only affirmed the Superior Court's findings that the 1993 Parade was not a protected exercise of the Veterans' First Amendment rights and, therefore, the exclusion of GLIB based on the sexual orientation of its members was an impermissible violation of the Public Accommodation statute. *Id.* at 250–251, 636 N.E.2d 1293. The Supreme Judicial Court also rejected the argument presented by the dissent, *see* 418 Mass. at 253–61, 636 N.E.2d 1293 (Nolan, J., dissenting) that requiring the inclusion of GLIB in the 1993 Parade violated the Veterans' right not to be compelled to symbolically convey an idea they find morally objectionable. *Id.* at 250 n. 19, 636 N.E.2d 1293.

Significantly for this case, both the Superior Court and the Supreme Judicial Court explicitly recognized that their respective rulings were based on particular facts concerning the 1993 Parade which might differ materially in a future case. The Superior Court stated that while the application of the Public Accommodation statute to the 1993 Parade did not violate the Veterans' right to expressive association, "[t]his is not to say ... that the Parade can never become a protected First Amendment activity." Superior Court Decision at 31 n. 27. Similarly, the Supreme Judicial Court stated:

We do not suggest that every parade is nonexpressive or that every parade is necessarily a place of public accommodation. Rather, we base our conclusions on the unique nature of the facts found as to the Parade in controversy. 418 Mass. at 250 n. 18, [636 N.E.2d 1293.]

\* \* \* \* \* \*

We leave open for an appropriate case the question whether the public accommodation law could be applied to a genuine exercise of First Amendment rights. *Id.* at 251 n. 21 [636 N.E.2d 1293.]

More recently, in the context of GLIB's motion for contempt, the Superior Court stated that a factual inquiry would be necessary to determine whether the 1995 Parade is materially different than the 1993 Parade and, if

so, whether the First Amendment requires that the Veterans be permitted to exclude GLIB from the 1995 Parade. *GLIB v. City of Boston,* August 23, 1994 Tr. at 17, 27–28.

As described earlier, none of the parties sought to have the Superior Court make the essential, threshold inquiry concerning whether there has been a change in material facts. It is, therefore, incumbent upon this court to do so.

This court has applied the law of Massachusetts concerning collateral estoppel. *See Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980); *Kowalski v. Gagne,* 914 F.2d 299, 302 (1st Cir.1990). Massachusetts courts apply principles of preclusion in a traditional manner, consistent with the United States Supreme Court's holding in *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). *See Isaac v. Schwartz,* 706 F.2d 15, 16 (1st Cir.1983); *Fidler v. E.M. Parker, Inc.* 394 Mass. 534, 539–40, 476 N.E.2d 595 (1985) (*quoting, Montana*); *Miles v. Aetna Casualty and Surety Co.,* 412 Mass. 424, 426–27, 589 N.E.2d 314 (1992) (same). In *Montana,* the Supreme Court explained:

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies....' To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana,* 440 U.S. at 153–54, 99 S.Ct. at 973–74, *quoting, Southern Pacific Railroad Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27–28, 42 L.Ed. 355 (1897).

Thus, in Massachusetts, as under federal law, to invoke collateral estoppel the following requirements must be met: (1) the issue on which preclusive effect is sought

must have been actually litigated and determined; (2) the decision must have been a valid and final judgment; (3) the determination must have been essential to the judgment; and (4) the estopped party must have had a full and fair opportunity to litigate the issue. *See Kowalski,* 914 F.2d at 302; *Martin v. Ring,* 401 Mass. 59, 60–61, 514 N.E.2d 663 (1987); *Massachusetts Property Insurance Underwriting Association v. Norrington,* 395 Mass. 751, 756, 481 N.E.2d 1364 (1985); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 *see also* Restatement (Second) of Judgments § 27 (1982), *cited in, Miles,* 412 Mass. at 427 n. 2, 589 N.E.2d 314. Even where these elements are satisfied, however, collateral estoppel does not operate to bar litigation of a claim where, in the period between the initial decision and the subsequent case, a controlling fact has changed. *Montana,* 440 U.S. at 155, 157–58, 99 S.Ct. at 974, 975–76; *Morganelli v. Building Inspector of Canton,* 7 Mass.App. 475, 388 N.E.2d 708, 709 n. 4 (1979).

■ There is a valid and final state court judgment concerning the 1993 Parade. The pendency of the Veterans' petition for certiorari does not qualify this conclusion. *See Taunton Gardens Co. v. Hills,* 557 F.2d 877, 879 n. 2 (1st Cir.1977) (pendency of appeal does not destroy res judicata effect of judgment). The final judgment resulted from proceedings which afforded the Veterans a full and fair opportunity to litigate their First Amendment claims concerning the 1993 Parade.

■ Where, as here, the appellate court did not affirm every ruling of the lower court, only the decisions essential to the appellate court's holding are entitled to preclusive effect. *See* R.S. Judgments § 27, Comment o; *Dow Chemical v. United States Environmental Protection Agency,* 832 F.2d 319, 323 (5th Cir.1987) ("federal decisions agree that once an appellate court has affirmed on one ground and passed over another, preclusion does not attach to the ground omitted from its decision"), *citing,* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* § 4421 at 205 (1981) ("Wright and Miller").

Accordingly, the facts essential to the Supreme Judicial Court's decision concerning the 1993 Parade are entitled to preclusive effect unless there has been a change in a controlling fact with regard to the 1995 Parade.

■ For the purposes of the instant case, the essential fact determined by the Superior Court and relied upon by the Supreme Judicial Court was the Superior Court's finding that it was "impossible to discern any specific expressive purpose entitling the [1993] Parade to protection under the First Amendment." Superior Court Decision at 30; 418 Mass. at 251, 636 N.E.2d 1293. As explained earlier, although the Superior Court stated that the infringement of any expressive association right the Veterans may have had was outweighed by the state's interest in eradicating discrimination, Superior Court Decision at 30–31, the Supreme Judicial Court did not reach this issue. *See* 418 Mass. at 249, 251 n. 20, 636 N.E.2d 1293. Thus, the Superior Court's ruling on the merits of the expressive association claim is not entitled to preclusive effect. *See Dow Chemical,* 832 F.2d at 323. The critical inquiry concerning collateral estoppel, therefore, is whether there has been a material change in the facts concerning the 1995 Parade which gives the Veterans' proposed conduct the discernible expressive purpose necessary to implicate the Veterans' First Amendment rights to expressive association and free speech.

Minor factual variations between the 1993 Parade and the 1995 would not be sufficient to escape the bar of collateral estoppel. *Isaac,* 706 F.2d at 17; *Walsh v. International Longshoremen's Association,* 630 F.2d 864, 874 (1st Cir.1980). Rather, to defeat preclusion, it must be shown that "the new facts are relevant under the legal rules that control the outcome." Wright & Miller, *supra,* § 4417 at 154–55.

■ Ordinarily, the party asserting collateral estoppel bears the burden of demonstrating that all the requisite elements are present. *See, e.g., Commonwealth v. Lopez,* 383 Mass. 497, 499, 420 N.E.2d 319 (1981). Where, as here, however, the period between the two cases is short, the burden of proving

that collateral estoppel does not defeat a claim may be placed on the plaintiff. *See* R.S. Judgments § 27, Comment c; *Napper v. Anderson, Henley, Shields, Bradford & Pritchard,* 500 F.2d 634, 637 (5th Cir.1974), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *Continental Airlines, Inc. v. American Airlines, Inc.,* 824 F.Supp. 689, 712 (S.D.Tex.1993). Accordingly, the court has required the Veterans to prove a change in controlling facts entitling them to consideration of their First Amendment claims regarding the 1995 Parade. They have done so with regard to their expressive association and free speech claims, but not concerning their compelled speech claim.

■ The Superior Court's decision that the 1993 Parade was a public accommodation relied largely on the court's findings that the Veterans: had no written standards or procedures for selecting participants; did not generally inquire into the specific messages or views of each applicant; and did not exercise selectivity concerning whom they would allow to march. Superior Court Decision at 9–11. With regard to the 1995 Parade, the Veterans have adopted the written Regulations to guide their selection of marchers. In addition, the 1995 Parade Participation Agreement, which must be submitted by all who wish to march, requires more substantial information with regard to the nature of the group seeking to participate and what its signage and/or handouts will be. *See* Regulations at 6–7 and 11–12 (Participation Agreement). This information will assist the Veterans in determining whether each group's message is consistent with the Veterans' themes. Although the Veterans do not intend to require any group to agree with their themes or to express a particular message, they also do not intend to allow any group to express a message which is inconsistent with any of the Parades' three themes. Regulations at 3–4. Furthermore, in contrast to past practice, no group will be admitted on the day of the Parade.

The adoption of the Regulations, however, does not constitute the change of controlling facts necessary to defeat the claim of collateral estoppel. Rather, the Regulations largely memorialize past practices. The 1995 Parade Participation Agreement does require that all applicants fully describe their units and signs or banners. *See* Regulations at 4, 12. The Regulations also explicitly permit the Parade Committee to reject any unit it believes reflects a message and expression the Parade Committee deems inappropriate. *Id.* at 3–4. It is undisputed, however, that it has long been the policy of the Veterans to exclude such groups and that the Superior Court was informed that organizations such as the Ku Klux Klan and ROAR had been excluded from prior Parades on this basis. *See* Superior Court Decision at 9. Previously, those facts did not persuade the Superior Court that the 1993 Parade was not a public accommodation. Thus, the codification of this standard does not constitute a new, material fact.

However, the inclusion in the 1995 Parade of a protest against the judicially compelled inclusion of GLIB in prior Parades, which also honors the people of South Boston who participated in a motorcade to engage in a similar protest when the 1994 Parade was cancelled, is a material change in the controlling facts. This new fact provides the 1995 Parade with the discernible expressive purpose that the courts of the Commonwealth found to be lacking with regard to the 1993 Parade. Accordingly, the Veterans have now established that the 1995 Parade will involve the exercise of their First Amendment rights to associate for expressive purposes and to free speech. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984) (party seeking First Amendment protection has burden of proving exercise of First Amendment rights).

As the Superior Court and Supreme Judicial Court each correctly recognized, in certain circumstances a parade may constitute expressive conduct protected by the First Amendment. *See* Superior Court Decision at 31 n. 27; 418 Mass. at 250 n. 18, 636 N.E.2d 1293; *see also Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969); *Walker v. City of Birmingham,* 388 U.S. 307, 315, 87 S.Ct. 1824, 1829, 18 L.Ed.2d 1210 (1967); *Forsyth County, Georgia v. Nationalist Movement,*

—— U.S. ——, ——, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992). Streets are places that have long been used to communicate ideas and opinions. *See Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Indeed, public streets are the "archetype of a traditional public forum." *Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988).

In determining whether particular conduct, including a parade, "possesses sufficient communicative elements to bring the First Amendment into play, [a court must] ask whether 'a[n] intent to convey a particularized message [is] present, and [whether] the likelihood [is] great that the message [will] be understood by those who view[ ] it'." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989), *quoting, Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730–31, 41 L.Ed.2d 842 (1974).

In this case, the Veterans do intend to use the 1995 Parade to convey a particularized message—their strong protest against the decisions of the courts of the Commonwealth that compelled the inclusion of GLIB in prior Parades and prompted the cancellation of the 1994 Parade. As explained earlier, neither the City nor GLIB has claimed that this stated purpose of the 1995 Parade is a pretext for seeking to exclude GLIB from marching. Nevertheless, the court has independently considered whether the protest theme is merely a pretext adopted in an effort to invoke federal jurisdiction and evade the Superior Court's continuing injunction. The court finds it is not. Rather, the protest theme to be incorporated in the 1995 Parade is a sincere expression of views strongly held by the Veterans and other individuals.

In addition, the protest will be a significant part of the 1995 Parade. The evidence indicates that the 1995 Parade will, if conducted, have far fewer participating units than prior Parades because of the limited time available to raise money and recruit participants. The protest will be a prominent part of the smaller 1995 Parade. The 1995 Parade will begin with a motorcade of vehicles exhibiting black flags, each of the several divisions will be led by a person carrying a black flag, and Parade officials will wear black armbands. To be sure, the 1995 Parade will again seek to serve other purposes, including honoring St. Patrick, celebrating traditional family values as the Veterans define them, and providing entertainment. The protest, however, will not be a *de minimis* element of the 1995 Parade; it will be a significant aspect of the event.

The protest message to be communicated by the 1995 Parade is likely to be understood by those who view it. The meaning of the motorcade, black flags, and black attire have already been widely discussed in South Boston. It is foreseeable that their import will also be publicized in the media. Similar expressive conduct has been deemed to be within the ambit of the First Amendment. *See, e.g., Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 505, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969) (wearing black armbands to protest Vietnam War); *Johnson,* 491 U.S. at 404–07, 109 S.Ct. at 2539–41 (burning of American flag to protest policies of Reagan administration); *Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (playing loud music to protest racism). Parades sponsored by private organizations and containing a variety of participants and themes have also been accorded constitutional protection. *See, e.g., Long Beach Lesbian and Gay Pride, Inc. v. City of Long Beach,* 14 Cal.App.4th 312, 17 Cal.Rptr.2d 861, 865–867 (1993) (festive parade with cars, floats and pedestrians that was designed to commemorate gay and lesbian rights movement, espouse such rights, and celebrate participants' pride in their sexual orientation, is entitled to constitutional protection); *New York County Board of Ancient Order of Hibernians v. Dinkins,* 814 F.Supp. 358, 367, 358 (celebratory parade with over 150,000 marchers, designed to honor St. Patrick, the patron saint of Ireland, and to proclaim allegiance to Roman Catholic Church and its teachings, is protected by First Amendment) (*"Dinkins"*).

With its new, explicit protest message, which will be widely understood, the 1995 Parade has the discernible expressive pur-

pose that the courts of the Commonwealth found to be lacking with regard to the 1993 Parade. The 1995 Parade is, therefore, "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence*, 418 U.S. at 409, 94 S.Ct. at 2730. Accordingly, collateral estoppel does not bar the Veterans' First Amendment expressive association and free speech claims. However, as discussed in § IV.E, *infra*, the Veterans' forced speech claim is barred. Accordingly, this court must decide the question the Supreme Judicial Court did not address—whether the First Amendment requires that the Veterans be permitted to exclude GLIB from the 1995 Parade.

### C. The Right of Expressive Association

The First Amendment right of the Veterans to associate for expressive purposes is implicated in this case.[6] "The ability and opportunity to combine with others to advance one's views is a powerful practical means of ensuring the perpetuation of the freedoms the First Amendment has guaranteed against the government." *New York State Club Association, Inc. v. City of New York*, 487 U.S. 1, 13, 108 S.Ct. 2225, 2234, 101 L.Ed.2d 1 (1988). Moreover, the Constitution guarantees freedom of association for the purpose of engaging in activities protected by the First Amendment "as an indispensable means of preserving other individual liberties." *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3249.

In an analogous case deciding that the Ancient Order of Hiberians could not be compelled to include gays and lesbians in their St. Patrick Day Parade in New York City, the court held that: "[i]nsofar as a parade constitutes protected free speech, it cannot be a public accommodation" subject to state anti-discrimination laws. *Dinkins*, 814 F.Supp. at 366. In its ruling in *GLIB v. City of Boston*, the Supreme Judicial Court articulated the issue differently, stating that it was unnecessary for it to decide "whether the [Massachusetts] public accommodations law

permissibly could be applied to a genuine exercise of First Amendment rights." 418 Mass. at 252 n. 21, 636 N.E.2d 1293. On the facts of this case, regardless how the question is framed, the answer is the same: the compelled inclusion of GLIB in the 1995 Parade would violate the Veterans' First Amendment right to associate for expressive purposes.

██ The Supreme Court has held that "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama*, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958); *see also Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981) ("First Amendment rights [of association are] always subject to exacting judicial review"). It is also clear that:

> The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.

*Roberts*, 468 U.S. at 623, 104 S.Ct. at 3252.

The test prescribed by *Roberts* has at times been characterized as "strict scrutiny." *See, e.g., Salvation Army v. Department of Community Affairs of New Jersey*, 919 F.2d 183, 200 (3d Cir.1990) ("[t]he *Roberts* opinion teaches that strict scrutiny is to be applied to infringements on the freedom of association for free speech purposes ..."); *Korenyi v. Department of Sanitation*, 699 F.Supp. 388, 394 (E.D.N.Y.1988) (Supreme Court "has engaged in strict scrutiny" of state action that implicates right to associate for expressive purposes.) However, as described by Justice Sandra Day O'Connor in her concurrence in *Roberts*, the Supreme Court has actually articulated a "balancing-of-interests test" to determine claims alleging violations of the right

---

**6.** The Veterans do not assert that any right they may have to "intimate association" is at issue here. *See Roberts*, 468 U.S. at 617–18, 104 S.Ct. at 3249–50 ("choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State ...")

to associate for expressive purposes. 468 U.S. at 632, 104 S.Ct. at 3257 (O'Connor, J., concurring); *see also Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont,* 700 F.Supp. 281, 289 (D.Md.1988) (Supreme Court has engaged in a "balancing analysis in examining the various rights involved" in expressive association cases). Implicitly applying the *Roberts* balancing test, the Supreme Court subsequently found that a statute interpreted to require Rotary Clubs to admit women did not violate the First Amendment because even if it did "work some slight infringement on Rotary members' right of expressive association, that infringement [was] justified because it serve[d] the States' compelling interest in eliminating discrimination against women." 481 U.S. at 549, 107 S.Ct. at 1948. Accordingly, this court must apply the *Roberts* test and balance the legitimate, competing interests implicated by the 1995 Parade.[7]

It should be clearly recognized, however, that the balancing of interests test prescribed by the Supreme Court in *Roberts* does not require or permit the court to assess the validity or value of the views the Veterans seek to express. The First Amendment applies without regard to "the truth, popularity, or social utility of the ideas and beliefs which are offered." *NAACP v. Button,* 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963). As the Supreme Court has explained, courts are not empowered to evaluate the merits of protected expression. Rather, "under the First Amendment, there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).

It is important that courts recognize the limits of their powers if the First Amendment is to operate effectively. Judges are generally chosen from the mainstream of their communities. They are likely to share many views which are popular with their contemporaries. There is, therefore, the danger that any judicial effort to evaluate the

---

7. As stated at trial, the court has considered, *sua sponte,* whether the mixed-motive analysis prescribed by the Supreme Court for discrimination cases in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), should be utilized to decide this case. In *Mt. Healthy* the Court ruled that where a party proves that his conduct was legally protected, and this conduct was a "substantial" or "motivating" factor in the decision to take adverse action against him, his adversary must prove that he would have made the same decision even in the absence of the protected conduct. *Id.*

The question whether a *Mt. Healthy* analysis should be utilized arises because while the Veterans' desire to protest unequivocally the decisions of the courts of the Commonwealth is a sincere and significant factor motivating their decision to exclude GLIB from the 1995 Parade, the court infers that even in the absence of the protest the Veterans would reject GLIB's request to participate because the Veterans do not want their Parade celebrating traditional families values to include what they regard as a "radical gay and lesbian group." Declining to address the merits of this case, neither the City nor GLIB has argued that the *Mt. Healthy* test should be applied or developed the evidence which would be necessary for the court to determine properly how that test would cause this case to be decided.

The Supreme Court has not discussed *Mt. Healthy* in deciding any case involving the right to associate for expressive purposes. Rather, it has uniformly applied the *Roberts* test. Federal cases in which *Mt. Healthy* has been employed involve protected conduct by victims of discrimination and legally permissible, but not constitutionally protected, alternative motives for the adverse action against them. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (employment discrimination based on gender in violation of Title VII); *Feliciano–Angulo v. Rivera Cruz,* 858 F.2d 40 (1st Cir.1988) (dismissal for exercise of First Amendment rights); *Howard v. Senkowski,* 986 F.2d 24, 26 (2d Cir.1993) (use of peremptory challenges in jury selection).

If *Mt. Healthy* were applied in the instant case and the Veterans did not prevail, their constitutional right to associate for expressive purposes would be trumped by the mere existence of GLIB members' statutory right not to be discriminated against based on their sexual orientation. Thus, the *Mt. Healthy* test would be less protective of constitutional rights than the more nuanced *Roberts* balancing of interest test, which subjects infringements of First Amendment rights to exacting scrutiny.

This court does not believe that the *Mt. Healthy* test is applicable to this case. In any event, if *Mt. Healthy* were deemed applicable, further evidentiary proceedings would be required for the court to make the necessary factual findings, including whether one reason for GLIB's exclusion from the 1995 Parade is the sexual orientation of its members.

merit of particular speech or speakers will result in equating the agreeable with the valuable and the unpopular with the unimportant. This, however, would tend to deny the protection of the First Amendment to those who need it most. For as a friend of Elijah Lovejoy, the Abolitionist printer killed in the riots that his publications provoked, said at the time, " '[w]e are more especially called upon to maintain the principles of free discussion in the case of unpopular sentiments or persons, as in no other case will any effort to maintain them be needed.' " Z. Chafee, *Free Speech in the United States*, at 4 (Harvard University Press, 1948), *quoting*, Edward Beecher, *Alton Riots*, (Alton, Ill., 1838); *see also Osborne v. Ohio*, 495 U.S. 103, 148, 110 S.Ct. 1691, 1717, 109 L.Ed.2d 98 (1990) (Brennan, J., dissenting) ("[w]hen speech is eloquent and the ideas expressed lofty, it is easy to find restrictions on them invalid. But were the First Amendment limited to such discourse, our freedom would be sterile indeed.")

■ The facts of this case require that the Court apply the test prescribed by *Roberts*. The nature of the Veterans' annual Parade has genuinely evolved. The Veterans now sincerely seek to use the 1995 Parade as a means to protest the judicially compelled inclusion of GLIB in prior Parades. The conduct of the courts is a matter of public concern and speech addressing such matters is at the core of expression the First Amendment is intended to protect. *See Frisby*, 487 U.S. at 479, 108 S.Ct. at 2499–2500. As indicated earlier, there is a "close nexus between the freedoms of speech and assembly." *NAACP v. Alabama*, 357 U.S. at 460, 78 S.Ct. at 1171. The First Amendment right of expressive association merges the rights of speech and assembly to serve vital interests in our democracy.

> An individual's freedom to speak, to worship, and to petition the Government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.

*Roberts*, 468 U.S. at 622, 104 S.Ct. at 3252.

The Massachusetts statute prohibiting discrimination in public accommodations gener-ally satisfies the second prong of the *Roberts* test. It is not aimed at the suppression of ideas. Rather, like the statute at issue in *Roberts*, the Massachusetts statute "reflects the [Commonwealth's] strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services. That goal, which is unrelated to the suppression of expression, plainly serves compelling state interests of the highest order." *Roberts*, 468 U.S. at 624, 104 S.Ct. at 3253; *see also Zobel*, 830 F.Supp. at 649. ("[e]liminating discrimination based upon sexual orientation is a ... significant state interest").

Accordingly, it is necessary to consider carefully the particular facts of this case to determine whether the infringement on the Veterans' right to associate for expressive purposes is necessary to serve the Commonwealth's interest in combatting discrimination based on sexual orientation or whether less restrictive means of advancing the interests implicated are available. Answering this question requires identifying and balancing the interests that are in tension here.

As part of their protest of the decisions of the courts of the Commonwealth compelling GLIB's inclusion in prior Parades, the Veterans seek to exclude GLIB from marching in the 1995 Parade as an identifiable group. The Veterans could register their protest at other times or in ways other than parading. Expressing their dissent in connection with the traditional St. Patrick's Day Parade, however, is a uniquely powerful means of expressing the Veterans' protest and, in view of the foreseeable publicity, having that protest widely heard and considered.

The Veterans believe that including GLIB in the 1995 Parade would make a mockery of the message the Veterans wish to communicate. The court concludes that even if the 1995 Parade included signs and other symbols protesting GLIB's participation, the inclusion of GLIB would confuse and mute the Veterans' message. Moreover, if compelled to include GLIB, the Veterans will not conduct the 1995 Parade.

Accordingly, if the Public Accommodation statute compels the inclusion of GLIB in the 1995 Parade, there would be a direct and significant burden on the Veterans' right to associate for expressive purposes. The right of an expressive association to define its membership "derives from the recognition that the formation of an expressive association is the creation of a voice, and the selection of members is the definition of that voice." *Roberts,* 468 U.S. at 633, 104 S.Ct. at 3258 (O'Connor, J., concurring). Accordingly, the Supreme Court has explained, a regulation which requires a group to accept members it does not desire "may impair the ability of the original members to express *only* those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate." *Id.* at 623, 104 S.Ct. at 3252 (emphasis added). The compelled inclusion of GLIB in the 1995 Parade would impair the Veterans' ability to communicate only the views that have brought them together this year. *Id.* at 623, 104 S.Ct. at 3252-53.

This case is, therefore, distinguishable from *Roberts, Rotary,* and *New York State Club* with regard to the burden that application of the state anti-discrimination statute would place on the Veterans' right to associate for expressive purposes. In *Roberts,* the Jaycees failed to demonstrate that the statute requiring admission of females "impose[d] any serious burdens on the male members' freedom of expressive association." 468 U.S. at 626, 104 S.Ct. at 3254. Rather, enforcement of the statute only caused "incidental abridgement" of protected speech which was "no greater than [was] necessary to accomplish the State's legitimate purposes." *Id.* at 628, 104 S.Ct. at 3255. In *Rotary,* the Court found that requiring the admission of women to Rotary Clubs would not affect in "any significant way the existing members' ability to carry out their various purposes", 481 U.S. at 548, 107 S.Ct. at 1947, and that even if there were some "slight infringement, on Rotary members' right of expressive association, that infringement [was] justified because it serve[d] the State's compelling interest in eliminating discrimination against women." *Id.* at 549, 107 S.Ct. at 1948. In *New York State Club,* the plaintiff

organizations failed to show that their expressive activities would be affected at all. 487 U.S. at 13-14, 108 S.Ct. at 2234-35.

In *New York State Club,* however, the Supreme Court anticipated that "an association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to [certain groups]." *Id.* at 13, 108 S.Ct. at 2234. In *Invisible Empire,* the court confronted the quintessential case where "the membership and the message were co-extensive" and held that an anti-discrimination regulation could not be applied to compel the inclusion of blacks in a Ku Klux Klan parade intended to advocate white separatism. 700 F.Supp. at 289. Although the Veterans' 1995 Parade has several sincere and significant themes, this case is comparable to *Invisible Empire* because the Veterans' right to expressive association will be directly and substantially impaired if they are required to allow GLIB to participate in order to obtain a permit for the Parade.

 The fact that there would be a substantial burden on the Veterans' First Amendment rights if GLIB's inclusion in the 1995 Parade were compelled does not, however, end the inquiry. Rather, the court must assess the value to GLIB of participating if a 1995 Parade is held, and decide whether there are means of comparably serving the state's interest without injuring the Veterans' ability to associate for expressive purposes.

The Veterans do not seek to exclude members of GLIB from participating in the 1995 Parade without identifying their sexual orientation, either by marching individually or as part of other groups. As eloquently expressed by Mr. O'Connor, however, the members of GLIB want to march as an identifiable group in the 1995 St. Patrick's Day Parade for two reasons. First, they want to proclaim that although they are gays, lesbians, or bisexuals, they are also Irish and a part of the Irish family. Second, they hope that if people see that the members of GLIB "are their brothers and sisters and sons and daughters," they will more quickly and fully

accept them as part of the Irish community, and discrimination based on sexual orientation will diminish. Dec. 15, 1994 Tr. at 22. However, GLIB does not contend, and the court does not find, that there is any professional or commercial benefit to its members in marching in the Parade.

The fact that participating in the St. Patrick's Day Parade does not injure the access of members of GLIB to publicly available goods or services distinguishes this case from *Roberts, Rotary,* and *New York State Club.* In *Roberts,* the Supreme Court found the statute prohibiting discrimination in public accommodations reflected the state's "strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services." 468 U.S. at 624, 104 S.Ct. at 3253. The Court found that the Jaycees provided its members various commercial programs, benefits, business contacts, and opportunities for professional advancement. *Id.* at 626, 104 S.Ct. at 3254. The Court, therefore, held that, "[a]ssuring women equal access to such goods, privileges, and advantages clearly furthers compelling state interests." *Id.* Subsequently, the Supreme Court held that requiring admission of women to Rotary Clubs was constitutional because the government's "compelling interest in assuring equal access to women extends to the acquisition of leadership skills and business contacts ..." *Rotary,* 481 U.S. at 549, 107 S.Ct. at 1948.

Neither the Supreme Court, nor any other court, however, has addressed the issue of whether there is a compelling state interest in preventing discrimination which deprives a person of his or her individual dignity, but not of any publicly available goods, services, or opportunities for commercial or professional advancement. At least one commentator has expressed the view that "[u]nlike the concern for equality ... the state interest in eliminating the insult, hate, and divisiveness that accompany invidious discrimination is not properly considered 'compelling'" W.P. Marshall, *Discrimination and the Right of Association,* 81 N.W.U.L.Rev. 68, 97 (1986). This court assumes, however, that preventing the injury to individual dignity, or stigma, caused by exclusion from an organization or

activity is a compelling state interest for the purpose of invoking the *Roberts* test.

■ In applying that test, the court fully accepts—and deeply regrets—that it will be personally painful for members of GLIB to be denied the opportunity to use the 1995 Parade to proclaim that they are truly Irish as well as gay, lesbian or bisexual. Moreover, there is a stigma attached to their exclusion. As Mr. O'Connor implicitly acknowledged, however, a similar stigma attaches when a court order is necessary to achieve GLIB's inclusion in the Parade and GLIB's members are subject to protests from other participants and some spectators.

Moreover, it is significant that the indignity involved in excluding GLIB is being imposed by a private group, rather than by the government; the members of GLIB are adults, not children; and members of GLIB are not generally being excluded from participation in the political, economic, or cultural life of the community, but from a single event. In these circumstances, the harm to GLIB's members, while genuine, is limited. *Compare Brown v. Board of Education,* 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (government separating black school children "from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.") In addition, from the perspective of many objective observers, the Veterans' decision to exclude GLIB from the 1995 Parade is likely to reflect negatively on the Veterans rather than members of GLIB. Moreover, the exclusion of GLIB from the 1995 Parade will not deprive "society the benefits of [GLIB members'] participation in political, economic, and cultural life." *Roberts,* 468 U.S. at 625, 104 S.Ct. at 3253.

In any event, to the extent that members of GLIB want to proclaim publicly on St. Patrick's Day that they are part of the Irish family, there are alternatives to marching in the Veterans' Parade. There has, for example, been no showing that they would not be permitted to march in other St. Patrick's Day Parades held in Massachusetts. In addition, a second St. Patrick's Day parade or event

could be organized in Boston. In New York, after the Hibernians were allowed to exclude GLIB's counterpart, the Irish Lesbian and Gay Organization ("ILGO"), from the 1992 St. Patrick's Day Parade, ILGO held its own demonstration along Fifth Avenue and "[v]irtually every elected city official marche[d] with ILGO." Sarah Hollander, "March Madness: NY'ers split on Judge's parade edict," *Newsday*, Feb. 27, 1993 at 5.

Accordingly, the court is confronted with the question whether, despite the alternatives, the indignity which would be suffered by members of GLIB if excluded from the 1995 Parade justifies placing a direct and significant burden on the Veterans' right to associate for expressive purposes by compelling the inclusion of GLIB. It does not. Indeed, to give decisive weight to the harm to members of GLIB caused by the Veterans' expressive conduct would risk seriously undermining the protection provided by the First Amendment.

As Justice William Brennan wrote, the First Amendment represents a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254 at 270, 84 S.Ct. 710 at 721, 11 L.Ed.2d 686. "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it ... stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). Accordingly, "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969).

These principles have been applied to protect expressive conduct when Nazis sought to march through a community of Jewish survivors of the Holocaust in Skokie, Illinois, despite the court's finding that "the proposed demonstration would seriously disturb, emotionally and mentally ... many of the Village's residents." *Collin v. Smith*, 578 F.2d 1197, 1206 (7th Cir.1978). The same conclusion is required here, where there has been no showing of comparable injury to members of GLIB.

In summary, the Veterans have proven that their traditional Parade has evolved and that the proposed 1995 Parade will, sincerely and significantly, serve as a means of protesting the decisions of the courts of the Commonwealth which required the inclusion of GLIB in prior Parades. There are alternatives to participation in the Veterans' Parade which will permit GLIB to proclaim the plain fact that its gay, lesbian and bisexual members are also Irish. It will be disturbing for GLIB members to be excluded from the 1995 Parade. This, however, does not justify ordering the inclusion of GLIB in the 1995 Parade, which would have the effect of confusing and muting the Veterans' message if the event were held and, as a practical matter, will silence their protest.

Justice Louis Brandeis reminded us in 1927, that "[t]hose who won our [nation's] independence believed ... that the fitting remedy for evil counsels is good ones." *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., dissenting). The First Amendment embodies this faith. Those who believe that the Veterans' protest constitutes bad speech should, in the best tradition of our nation, let it be heard and respond to it with better speech.

### D. *Free Speech*

The Veterans contend that by conditioning the issuance of a Parade permit on their compliance with the Public Accommodation statute, the related Superior Court permanent injunction, and their admission of GLIB, the City has unconstitutionally restricted the Veterans' First Amendment right of free speech because their Parade is only properly subject to time, place, and manner regulations. Because the courts of the Commonwealth discerned no expressive purpose concerning the 1993 Parade, they did not decide the merits of the Veterans' free speech claim with regard to the 1993 Parade. *See GLIB v. City of Boston*, 418 Mass. at 249, 636 N.E.2d 1293. As the protest to be included in the 1995 Parade provides the expressive purpose necessary to qualify the Parade as

symbolic speech entitled to First Amendment protection, a controlling fact has changed and collateral estoppel does not preclude consideration of the Veterans' present free speech claim.

As described below, it is a close question whether the City's unwillingness to provide the Veterans a permit without the conditions now in dispute violates their right to free speech. The City's failure to address the merits of this case make it particularly difficult for the court to decide this issue, because there has been no evidence or argument presented on the degree to which the conditions are "narrowly tailored" to serve "'a substantial government interest that would be achieved less effectively absent the regulation[s]'", which are in this case the Public Accommodation statute and the related injunction. *See Turner Broadcasting System, Inc. v. Federal Communications Commission,* —— U.S. ——, ——, 114 S.Ct. 2445, 2469, 129 L.Ed.2d 497 (1994), *quoting, Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. Because the court has already concluded that the City's conduct violates the Veterans' right of expressive association, it is not necessary that the court decide whether their right to free speech is also infringed. As this question may recur, however, the following observations may be helpful.

▮▮▮▮ The 1995 Parade constitutes a form of symbolic speech. Restrictions on such speech have been analyzed under the test articulated in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). *See, e.g., Invisible Empire,* 700 F.Supp. at 287–88.

In *O'Brien,* the Court held that:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679. More recently, the Supreme Court has explained

that the *O'Brien* test "'is little, if any, different, from the standard applied to time, place, and manner restrictions.'" *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757, *quoting, Community for Creative Non–Violence,* 468 U.S. at 298, 104 S.Ct. at 3071. To be upheld, content neutral time, place and manner restrictions must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Education Association v. Perry Local Educators Association,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *see also Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. at 3069; *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981).

The Massachusetts Public Accommodation law, which is the foundation for the conditions the City seeks to impose, is content neutral because it is evident that it was not adopted for the purpose of suppressing speech. *See Ward,* 491 U.S. at 791, 109 S.Ct. at 2753–54 (the government's purpose is the controlling consideration in determining content neutrality); *cf. Invisible Empire,* 700 F.Supp. at 288 (nondiscrimination condition in parade permit not content neutral because it was developed only to apply to KKK); *Dinkins,* 814 F.Supp. at 368 (finding that anti-discrimination statute was not content neutral). For the reasons described previously, the governmental purpose to be served generally by the Public Accommodation statute—combatting discrimination—is "compelling." *See Roberts,* 468 U.S. at 624, 104 S.Ct. at 3253. Therefore, it also meets the lower *O'Brien* standard requiring that it be "significant."

The vexing questions which the defendants have not addressed, legally or factually, is whether the conditions that the City seeks to apply to the 1995 Parade are narrowly tailored to serve the government's significant interest and leave open ample alternative channels of communication. The "narrow tailoring" test requires a very fact specific inquiry concerning the government's interest and how it will be served. *See United States v. Doe,* 968 F.2d 86, 88 (D.C.Cir.1992) (sound decibel limits specified in regulation may be permissible for the Vietnam War Memorial,

but not for Lafayette Park). The question of whether there are adequate alternatives open to the Veterans if they cannot engage in their protest as part of the 1995 Parade also, obviously, requires the development of certain facts. Yet neither the City, which bears the burden of proof on this issue, *Doe,* 968 F.2d at 91, nor any other party has offered any evidence concerning it.

In the circumstances, it is not essential that the court now decide if the City's conduct, which violates the Veterans' right to associate for expressive purposes, also violates their right to free speech. Accordingly, on the present record, the court declines to do so.

E. *Freedom From Compelled Speech*

██ The Veterans also contend that conditioning the issuance of a permit for the 1995 Parade on the inclusion of GLIB would be a violation of the Veterans' right to refuse to express or foster an idea they find morally objectionable. In *Dinkins,* the court determined that applying a public accommodation statute to require the inclusion of a gay and lesbian group in the New York City St. Patrick's Day Parade would violate the Parade sponsors' right to be free from compelled speech. 814 F.Supp. at 366–68.

It is not perfectly clear what message the Veterans believe would be communicated by GLIB's participation in the 1995 Parade. It appears that the Veterans do not wish to be understood as endorsing or accepting the sexual orientation of GLIB's members. They also seem to consider the inclusion of an openly gay, lesbian and bisexual group to be inconsistent with the Parade's theme of celebrating the traditional Irish family and family values as the Veterans define them.

There is a meaningful question concerning what message, if any, would be attributed to the Veterans if GLIB marched in the 1995 Parade. *See Steirer v. Bethlehem Area School District,* 987 F.2d 989, 997 (3rd Cir. 1993) (court will not accept plaintiffs "ipse dixit" regarding the perceptions of the community which observes the plaintiff's compelled conduct); *cf. Dinkins,* 814 F.Supp. at 366 (the message intended to be conveyed by a parade sponsored by a private organization is to be determined by the parade sponsor and not by the city or state). This question, and others, are important to determining whether the Public Accommodation statute as applied to the Parade violates the Veterans' right of freedom from compelled speech. Collateral estoppel, however, bars this court from deciding the merits of this claim.

In *Wooley,* the Supreme Court held that a New Hampshire motorist could not be compelled to display a license plate with the State's motto, "Live Free or Die," because the "First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster ... an idea they find morally objectionable." 430 U.S. at 715, 97 S.Ct. at 1436. If this interest in being free from compelled speech is implicated, the court must apply the *O'Brien* test, 391 U.S. at 376–77, 88 S.Ct. at 1678–79, to determine whether the state's countervailing interest is sufficiently significant to justify the requirement at issue. *Id.* 430 U.S. at 715–16, 97 S.Ct. at 1435–36. Such an analysis may be appropriate with regard to the Parade.

Arguably, however, the Parade, in both 1993 and 1995, is in some respects analogous to the shopping center, open to all, whose owners, the Supreme Court found, could disavow messages expressed by people passing out pamphlets on their property, but could not exclude the leafletters altogether. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 77, 100 S.Ct. 2035, 2038–39, 64 L.Ed.2d 741 (1980). On the other hand, the 1995 Parade may be entitled to First Amendment protection not afforded to the owners of the shopping center in *PruneYard* because the Veterans are seeking to exercise their own First Amendment rights and are objecting to the message that they believe GLIB's participation in the 1995 Parade would communicate. *See Pacific Gas and Electric Company v. Public Utilities Commission,* 475 U.S. 1, 12, 106 S.Ct. 903, 909–10, 89 L.Ed.2d 1 (1986).

In view of the Supreme Judicial Court's decision in *GLIB v. City of Boston,* however, this court lacks the power to consider the merits of the Veterans' compelled speech

claim. As described earlier, the dissent in that case would have held for the Veterans based, in part, on the principles discussed in *Wooley*. *See GLIB v. City of Boston*, 418 Mass. at 254–57, 636 N.E.2d 1293 (Nolan, J., dissenting). In reaching its conclusion, the dissent contended that the majority erred in finding that its inability to discern any expressive purpose in the 1993 Parade meant the Veterans were not entitled to First Amendment protection. *Id.* As the dissent put it, "regardless of whether the parade has one message, ten messages, or no message at all, if GLIB's particular message is not in the parade, it cannot be constitutionally forced on the Veterans ..." *Id.* at 257, 636 N.E.2d 1293. This analysis reflects a correct reading of *Wooley*, in which the Supreme Court found it "unnecessary" to decide whether the plaintiff motorist was engaging in "symbolic speech" by covering up the offensive license plate because the right to be free from expressing a view to which he objected protected him nevertheless. *Wooley*, 430 U.S. at 713, 97 S.Ct. at 1434–35. The majority of the Supreme Judicial Court, however, rejected the dissent's analyses and declared that its "reliance on *Wooley* [was] misplaced." *GLIB v. City of Boston*, 418 Mass at 251 n. 19, 636 N.E.2d 1293.

Because this court believes that *Wooley* stands for the proposition that an individual has a First Amendment right not to express or foster a view that he finds morally objectionable, regardless of whether he is otherwise engaging in activity protected by the First Amendment, the protest theme which gives the 1995 Parade a new message is not a new *controlling* fact for the purposes of the Veterans' forced speech claim.[8] *See Montana*, 440 U.S. at 157–58, 99 S.Ct. at 975–76. Therefore, this court lacks the power to decide the merits of the Veterans' forced speech claim.

This does not, of course, mean that the Veterans are without recourse. The Supreme Court has the authority to review and, if appropriate, reverse the decision of the Supreme Judicial Court. It has granted the Veterans' petition for certiorari. The Veterans must, therefore, seek relief from the Supreme Court on their forced speech claim.

## V. RELIEF

In view of the foregoing, the court hereby declares, pursuant to 28 U.S.C. § 2201, that conditioning the issuance of a permit for the Veterans' 1995 St. Patrick Day Parade on the inclusion of GLIB violates the Veterans' right of expressive association under the First Amendment of the United States Constitution.

The City has, however, repeatedly represented that it is interested only in a determination of the rights of the Veterans and of GLIB, and in a clarification of its responsibilities with regard to the issuance of a Parade permit. The court, therefore, expects that this declaratory judgment will be sufficient to cause the City to issue promptly to the Veterans a permit for the 1995 Parade, on the usual terms and conditions. In the circumstances, the court does not now consider it necessary or appropriate to issue an injunction ordering officials of the City to issue the permit. *See Doran*, 422 U.S. at 931, 95 S.Ct. at 2567–68. ("At the conclusion of a successful federal challenge to a state statute or local ordinance, a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary.") The court does, however, hereby retain jurisdiction in this case in order to address any issues, including the propriety of injunctive relief, which may arise as a result of this decision.

The possible award of reasonable costs and attorneys fees, pursuant to 42 U.S.C. § 1988, is reserved for future consideration.

---

8. Except for the effect on the Veterans' protest theme discussed earlier, there is also not any evidence that the message to be communicated by GLIB's participation in the 1995 Parade would be any different than the message conveyed by GLIB's inclusion in prior Parades.